Eddie L. COLE, Jr.; Carol S. Cole; and Amanda L. Cole, Stephanie R. Cole, and Jennifer A. Cole, by and through their natural guardians and next friends, Eddie L. Cole, Jr., and Carol S. Cole, Plaintiffs,

v.

The UNITED STATES of America, Ronald Rawalt, Robert Howan, and Five Unknown FBI Agents, Defendants.

No. 4:CV94–3110.

United States District Court, D. Nebraska.

Feb. 2, 1995.

Elizabeth R. Herbert, Irigonegaray & Associates, Topeka, KS, for plaintiffs.

Sally R. Johnson, Asst. U.S. Atty., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

At approximately 9:38 p.m. on a spring evening in 1992, agents of the Federal Bureau of Investigation (FBI), looking for evidence of illegal wiretapping, executed a search warrant at the home of Eddie L. Cole, Jr. (Cole). Cole, his wife, and their three children lived in a small town in rural Nebraska where Cole was and is manager of the local telephone company. It now appears that the strange noise that aroused the FBI's concern was produced by malfunctioning telephone equipment.

Outraged by the conduct of the FBI, Cole, his wife, and their children sued the United States, FBI agents Ronald Rawalt (Rawalt) and Robert Howen (Howen),[1] and "five unknown FBI agents." (Filing 12 1st Am. Compl.) Plaintiffs' seven claims may be summarized as follows:

1. Rawalt made misstatements and omissions in the search-warrant application, and Howen made negligent statements that were incorporated in the search-warrant application, resulting in an unlawful search of the Cole residence in violation of the Fourth Amendment, such violation being a constitutional tort redressable under the doctrine announced in *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) [hereinafter *Bivens*]. (*Id.* ¶¶ 42–48.)

2. Rawalt, Howen, and the five unknown FBI agents executed the search warrant in an unreasonable manner by (a) conducting the search until the early morning hours when the search was limited to execution during the day; (b) "arresting" Plaintiffs without probable cause; and (c) otherwise executing the warrant in an "uncalled-for manner" in violation of the Fourth and Fifth Amendments, such violation being a constitutional tort redressable under the doctrine announced in *Bivens*. (*Id.* ¶¶ 49–58.)

3. In violation of the Fifth Amendment, Rawalt, Howen, and the five unknown FBI agents deprived Plaintiffs of their right to consult counsel when the agents told Carol Cole she was not to have an attorney present during the search, such violation being a constitutional tort redressable under the doctrine announced in *Bivens*. (*Id.* ¶¶ 59–64.)

4. In violation of the Fourth and Fifth Amendments, Rawalt, Howen, and the five unknown FBI agents seized Plaintiffs during the execution of the search warrant even though the warrant authorized no such seizure, such violation being a constitutional tort redressable under the doctrine announced in *Bivens*. (*Id.* ¶¶ 65–70.)

1. Agent Howen's last name is misspelled "Howan" in the complaint in this case. The correct spelling is indicated in the text. (Filing 30, Howen Decl.)

5. Rawalt, Howen, and the five unknown FBI agents intentionally restricted Plaintiffs' movements within the Cole home during the execution of the search warrant without leaving a reasonable means of egress and thereby falsely imprisoned the Plaintiffs, such violation being redressable under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (FTCA). (*Id.* ¶¶ 71–76.)

6. Rawalt, Howen, and the five unknown FBI agents intentionally caused Plaintiffs severe emotional distress by frightening them during the execution of the search warrant, such violation being redressable under the FTCA. (*Id.* ¶¶ 77–81.)

7. Howen negligently tested and analyzed a tape recording containing alleged "unusual noises," which negligence resulted in the filing of a defective application for search warrant and the issuance of a search warrant that would not have been issued but for such negligence, such violation being redressable under the FTCA. (*Id.* ¶¶ 82–86.)

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. (Filing 17.) The motion is supported by various sworn declarations. (Filing 18 Index Evidentiary Materials Supp. Mot.; Filing 30 Supplemental Index Evidentiary Materials Supp. Mot.) Defendants argue (1) that the complaint fails to state a claim upon which relief can be granted; and (2) that even if the complaint does state a claim, summary judgment should be granted because (a) Defendants did nothing improper, and/or (b) Defendants are entitled to qualified immunity from suit. Plaintiffs have responded to the evidence submitted by Defendants. (Filing 27 Index Evidentiary Materials Supp.Resp.)

Although I have empathy for Cole and his family, I shall grant Defendants' motion.

## I. UNDISPUTED MATERIAL FACTS

I find the following to be the undisputed material facts of this case for purposes of resolving Defendants' motion:[2]

1. Rawalt, a special agent of the FBI, began investigating the suspected unlawful interception of telephone communications ("wiretapping") in the spring of 1992 after receiving a complaint from a former employee of the Curtis Telephone Company (CTC), located in Curtis, Nebraska. (Filing 18, Rawalt Decl. ¶¶ 2–3.)

2. Carol Zak (Zak), a former employee of CTC, told Rawalt she was hearing noises on her telephone and she believed her telephone was being wiretapped by Cole, manager of CTC. (*Id.*)

3. Rawalt provided Zak with a recording device so she could record the noises she heard on her telephone. (*Id.*)

4. Howen is a special agent of the FBI, assigned since 1987 as a supervisory special agent in the Electronic Analysis Unit, Engineering Section, Information Resources Division, Washington, D.C. (Filing 18, Howen Decl. ¶ 1.)

5. Howen holds a bachelor's degree in electrical engineering and has extensive training and experience in telephone and microphone surveillance (wiretapping), including training in telephone repair. (*Id.* ¶¶ 2–3.)

6. Howen first learned of the investigation when a technically trained special agent (someone other than Rawalt) assigned to the FBI field office in Omaha, Nebraska, contacted him and described certain noises or tones on telephone lines during telephone calls involving victims of the alleged illegal wiretap. (*Id.* ¶ 4.)

7. Subsequently, Howen received a tape recording of a telephone call containing the tone that had previously been described to him. (*Id.* ¶ 5.)

8. Howen listened to the tape, utilized an electronic device to attempt to determine the frequency of the tone, conducted research on the brand of switch used by CTC to deter-

2. Many facts are in dispute. However, none of the disputed facts are material. The "mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment" if there is "no *genuine* issue of *material* fact." *Anerson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510.

mine if unusual tones such as those present were associated with the switch, consulted other individuals thought to be knowledgeable on the subject, and concluded that a wiretap could not be eliminated as a possible source of the tone. (*Id.*)

9. Howen advised Rawalt of his findings. (*Id.* ¶ 6.)

10. In early May, 1992, after an investigation that spanned a little more than a month and included interviews, surveillance, technical analysis, replacement of telephone equipment, and other investigative techniques, Rawalt decided to seek a search warrant, a decision made after consultation with an FBI special agent legal advisor, an FBI supervisory special agent, and an assistant United States Attorney. (Filing 18, Rawalt Decl. ¶¶ 4–5.)

11. With the assistance of an FBI special agent legal advisor, an FBI supervisory special agent, and an assistant United States Attorney, Rawalt prepared and submitted an affidavit for search warrant to a United States Magistrate Judge on May 8, 1992. (*Id.*, ¶¶ 5–6.)

12. In pertinent part, Rawalt's search-warrant affidavit stated under oath the following:

### AFFIDAVIT

Ronald C. Rawalt, Special Agent, Federal Bureau of Investigation (FBI), North Platte, Nebraska, being duly sworn states:

1. Your affiant has been a Special Agent of the FBI since 1976, and am presently assigned to the Omaha Division.

One of my investigative responsibilities is to investigate violations of Title 18, U.S.Code, Section 2511 and 2512, Interception of Communications.

2. Carol Zak, 9 Dee, Curtis, Nebraska, advised your affiant on a continuing basis between March 9, 1992, and May 3, 1992, the following information. On January 16, 1992, Carol Zak and Joleen [*sic*] L. Farrar terminated their employment with the Curtis Telephone Company, 102 Center Avenue, Curtis, Nebraska, under duress, believing they were about to be fired. Both individuals worked directly for Eddie

Cole, Jr., Manager of Curtis Telephone Company, Curtis, Nebraska. Cole resides at 210 Crook Avenue, Curtis, Nebraska. Both individuals terminated their employment because of personality conflicts with Cole. Both Carol Zak and Joleen Farrar, after appeal to the State of Nebraska Department of Labor Appeal Tribunal, were awarded unemployment benefits from Curtis Telephone Company for eight weeks.

3. On January 17, 1992, Carol Zak noticed unusual electronic noises (tapping noises) on her telephone line at the inception of a call received. This telephone was located at her residence 9 Dee, Curtis, Nebraska. These electronic noises have been predominately heard by Zak prior to 9:00 a.m., between 11:00 a.m. and 1:00 p.m. and after 5:00 p.m. Monday through Friday and at various times on Saturday and Sunday. These noises were still being heard by Zak at the time she first contacted your affiant and in the same pattern as mentioned above.

4. On March 9, 1992, at the request of your affiant, Zak placed a recording device on her telephone at 9 Dee, Curtis, Nebraska, to record the inception of all telephone calls received at her residence. Zak, or a member of her family, has recorded the inception of almost every telephone call received from March 9, 1992, until the present date.

5. On April 1, 1992, Zak began employment in Kearney, Nebraska, necessitating her living in Kearney Monday morning through Friday afternoon, with weekends being spent at her residence in Curtis, Nebraska. Carol Zak telephonically discussed with Joleen Farrar her week day residence change when she was aware that the electronic tapping noises were present.

6. Beginning April 1, 1992, the electronic tapping noises stopped during the week and began Friday afternoon after Zak arrived home from Kearney. The noises continued through the weekend until late Sunday night. No electronic tapping noises were noted by other family members during the week.

7. During conversations on the weekend of April 4 and 5, 1992, she advised Joleen Farrar that she would be back to Curtis the evening of Thursday, April 9, 1992, because she had to be in North Platte for the Department of Labor hearing relative to her employment termination. The evening of Thursday, April 9, 1992, Zak again noted noises present on her residence telephone.

8. On the weekend, prior to Monday, April 20, 1992, Carol Zak heard the tapping noises when she telephonically advised Joleen Farrar that she would be home in Curtis on Monday night the 20th and for Farrar to call her and they would discuss their suit against Eddie Cole, Jr.

9. On Monday night, April 20, 1992, Carol Zak received telephone calls at the residence prior to 10:00 p.m. that did not have electronic tapping noises. Eddie Cole, Jr.'s car was observed by Joleen Farrar at a drinking establishment in Curtis at approximately 10:00 p.m. Just prior to 10:25 p.m. Joleen Farrar verified that Eddie Cole, Jr.'s car was at his residence. At 10:25 p.m., Joleen Farrar telephonically contacted Carol Zak at Zak's residence and the electronic tapping noises were present. During the conversations, Carol Zak advised Joleen Farrar that she would be back in Curtis at her residence on Thursday, April 23, 1992.

10. On Thursday, April 23, 1992, Carol Zak received a telephone call from Joleen Farrar which had electronic tapping noises present. During this conversation, Joleen Farrar and Carol Zak discussed suing Eddie Cole, Jr. for his employment practices. Carol Zak advised that they (Carol Zak and Joleen Farrar) were to meet with an attorney in Kearney on Thursday, April 30, 1992, and find out if he would take their case and how much it would cost. Joleen Farrar telephonically agreed to go to Kearney to meet with Carol Zak and the attorney. Plans were telephonically discussed where Joleen Farrar and Carol Zak would call Carol Zak's residence at 9:30 p.m. on April 30, 1992, to discuss with both of their husbands what the attorney had advised. There is no suit by Carol Zak or Joleen Farrar against Eddie Cole, Jr.

The discussion of a suit between Farrar and Carol Zak was done during telephone calls that were believed to be monitored by Eddie Cole, Jr. at the request of the affiant to keep Eddie Cole, Jr. interested in telephone conversations between Carol Zak and Joleen Farrar.

11. On April 30, 1992, a physical surveillance was instituted by the agents of the FBI to establish Eddie Cole's presence at the time tapping noises were present on Carol Zak's home telephone. Eddie Cole, Jr. was surveilled from his office to his residence at approximately 4:59 p.m. At 6:01 p.m., a telephone call was received at the Zak residence and the electronic tapping noises were present. At 6:35 p.m. Eddie Cole was observed leaving his residence and driving to the employment of Joleen Farrar and also driving in front of and behind the residence of Joleen Farrar. Cole was observed to slow down and closely observe those locations.

12. On May 4, 1992, Sheriff Lanny Roblee, Frontier County, Curtis, Nebraska, advised the affiant that on May 1, 1992, Eddie Cole, Jr. requested Roblee to trace a license number observed at Carol Zak's residence on April 30, 1992. Cole said that an employee of his, Roger Bryant, lives next door to Zak and obtained the license for Cole. This license is assigned to a vehicle utilized by the FBI. A suitable pretext was subsequently furnished to Eddie Cole, Jr. by Sheriff Roblee per the affiant's request. During both conversations Cole had with Sheriff Roblee, Cole advised that he was being sued by Carol Zak and Joleen Farrar. Both Carol Zak and Joleen Farrar advised that they have not discussed this fictitious suit with anyone other than their respective husbands, who were at times party to telephone conversations. Roger Farrar and Ed Zak have advised the affiant that they have not discussed the fictitious suit with anyone other than their respective wives.

13. Carol Zak has advised the affiant that the garage across the street from the Eddie Cole residence, tan and brown in color, belongs to Eddie Cole and is utilized by him to park his personal vehicle.

14. Joleen Farrar advised the affiant that Eddie Cole told her in their last meeting before she quit her job that he did not care if it took $100,000.00 and a full audit team, he would spend that to fight Joleen Farrar and Carol Zak to force them out of the Curtis Telephone Company.

15. Carol Zak and Joleen Farrar also have advised the affiant that Eddie Cole, prior to working for Curtis Telephone Company, was an electronic technician for Strombery Carlson, the company that manufactured the electronic switching station and installed it in the Curtis Telephone Company home office.

16. Replacement of the telephones by Zak at the Zak residence has determined that the electronic tapping noise is not due to an equipment malfunction of the Zak home telephones as the noises continued to occur on the replacement telephones.

17. An analysis of this recorded electronic interference, believed to be from the result of a telephone tap, has been conducted by Supervisory Special Agent (SSA) Robert Howan of the Radio Engineering Division, FBIHQ, who during the latter part of April, 1992, has been personally advised of the facts of the case by your affiant and furnished recordings with the electronic noises present. SSA Howan is assigned to the Electronics Analysis Unit, Radio Engineering Division. He holds a degree in electrical engineering and is assigned case work on electronic evidence. He has conducted examinations of evidence relative to interception of communications since 1987. He has been trained through NYNEX as a telephone installer and repair technician.

18. SSA Howan advised that an examination of the electronic interference noise contained on the tapes furnished to him by the affiant indicates a 300 hertz (hz) tone. He further advised that his knowledge and data available through the Radio Engineering Division indicates the 300 hz tone is not generated by telephone switching or "home office" equipment and is therefore from an outside interference source. SSA Howan further stated that for the 300 hz

device to be turned off and on remotely from the Eddie Cole, Jr. residence, either a hard wired "jumper cable" or remotely activated computer program would necessarily be in place at the office of Curtis Telephone Company.

19. Based on the above information furnished by SSA Howan, the affiant believes that a wire tap exists on the telephones of Carol Zak, this tap is controlled from the residence of Eddie Cole, Jr., and is facilitated through a device or computer program at the Curtis Telephone Company.

(*Id.,* ¶ 6 and attached Ex. A.)

13. Howen has confirmed that the information attributable to him in the search-warrant affidavit prepared by Rawalt correctly represents what he told Rawalt. (Filing 18, Howen Decl. ¶ 7.)

14. Zak has confirmed that the information attributable to her in the search-warrant affidavit prepared by Rawalt correctly represents what she told Rawalt. (Filing 30, Zak Decl. ¶ 3.)

15. Jolene Farrar (Farrar) has confirmed that the information attributable to her in the search-warrant affidavit prepared by Rawalt correctly represents what she told Rawalt. (*Id.,* Farrar Decl. ¶ 3.)

16. A United States Magistrate Judge issued a search warrant for Cole's residence and CTC on May 8, 1992, authorizing the FBI to search for, among other things, "electronic equipment utilized in the illegal interception of communications of other parties." (Filing 18, Rawalt Decl. ¶ 6 and attached Ex. B.)

17. The search warrant directed the FBI to serve the warrant and make the search "in the daytime—6:00 a.m. to 10:00 p.m." (*Id.,* attached Ex. B.)

18. The search warrant was served at Cole's residence [3] at approximately 9:38 p.m. on May 13, 1992, "by a knock and announce procedure, as required by federal statute." (Filing 18, Rawalt Decl. ¶ 8.) The door was answered by Cole's 14–year–old daughter. (*Id.*) As soon as Rawalt entered the home,

---

**3.** The warrant was also served at CTC at about the same time.

Cole, who was in the living room where the front door was located, was told by Rawalt that he "had a federal warrant to search for a wiretap ... 'Do you understand?'" (Filing 27, Cole Decl. ¶ 5.) According to Rawalt's declaration, his reason for starting the search at 9:38 p.m. was to avoid detection by Cole, particularly because a prearranged call was to be made to the Zak residence immediately prior to execution of the search warrant and because Rawalt purportedly wanted to avoid disrupting the neighborhood. (Filing 18, Rawalt Decl. ¶ 7.)

19. All of the FBI agents were dressed in dark jackets with the large yellow letters "FBI" on them. (Filing 27, Cole Decl. ¶ 6.)

20. Although Cole observed that the agents were armed, there is no claim that any weapons were ever drawn. (Filing 28, Cole Decl. & C. Cole Decl.)

21. An armed and uniformed deputy from the local county sheriff's office accompanied FBI agents during the execution of the search warrant. (Filing 18, Douglas Decl. ¶ 2.)

22. The deputy sheriff, now an intensive supervision probation officer employed by the State of Nebraska, "did not participate in the search, but stood inside the front door of the residence." (Id.)

23. Although Plaintiffs and Defendants dispute precisely how the FBI agents proceeded to execute the search warrant, and although Carol Cole believes the deputy sheriff left the premises sometime during the search, the deputy, who is not a party to this action, has informed the court what he observed from his vantage point standing behind Rawalt as the Cole residence was approached and what he later observed from inside the front door of the Cole residence:

2. On May 13, 1992, I was a Deputy Sheriff in Frontier County, Nebraska. On that date, in my capacity as Deputy Sheriff, I accompanied Special Agent Ronald Rawalt to the residence of Eddie Cole in Curtis, Nebraska, to assist in the execution of a search warrant. Upon arriving at Cole's residence to execute the search warrant, I accompanied Special Agent Rawalt to the front door, where Special Agent Rawalt knocked on the door. After a few knocks on the door, a person answered the door who was not observed by me. When the door was opened, Special Agent Rawalt, other Agents and I proceeded in a calm orderly fashion into the residence. Special Agent Rawalt approached Eddie Cole, who was on the couch in the living room of the residence, and advised Cole of the fact that he was with the Federal Bureau of Investigation and that a search warrant was going to be executed at the residence. I did not participate in the search, but stood inside the front door of the residence throughout the search.

3. During the search, I saw other Agents proceed to various locations in the house, but I saw no Agents rushing or running in an uncontrolled manner. I have been involved in and present during numerous search warrant executions. In my law enforcement experience, this was one of the calmest and most polite search warrant executions that I have ever seen.

4. The execution of the search warrant was the smoothest, and least emotional that I have ever seen. All Agents acted in an extremely professional manner throughout the search.

(Id., ¶¶ 2–4.)

At the end of the search, Cole complimented Rawalt for not "trashing" his home, or words to that effect. (Filing 27, Cole Decl. ¶ 14.)

24. Carol Cole (Cole's wife) was preparing to bathe when the search warrant was executed. She first saw the FBI agents when they came into her bedroom without knocking. She was naked from the waist up. She was told by the two agents, one a man and one a woman, to "'put on a T-shirt and come and sit in the living room.'" (Filing 27, C. Cole Decl. ¶ 2.)

25. Carol Cole dressed, proceeded to the bedroom where her two 10–year–old daughters normally slept, determined that the children were frightened, and took the two children with her to the living room. (Id., ¶¶ 2–3.)

26. It was apparent to Mrs. Cole that the two 10–year–olds had been awakened by the FBI agents because the children, who were

in their beds, asked Mrs. Cole, "Why are they in our room with flashlights?" (*Id.*) It was also apparent to Mrs. Cole that the agents had left the girls in the bedroom as the bedroom door was closed, the bedroom light was off, and the girls were in their beds. (*Id.*)

27. At some point, the Cole family—Mr. and Mrs. Cole, their 14–year–old daughter and their two 10–year–old daughters—were assembled in the living room of the Cole residence. (Filing 27, Cole Decl. ¶ 7.)

28. Precisely what Cole and his family were told by Rawalt and the other FBI agents who were present is in dispute, but the following material facts are undisputed as to what the Cole family did, what the Cole family was allowed to do, and what, if any, contemporaneous complaints were made by the Cole family:

(a) The Cole family was not allowed to use the telephone in their home for a short period of time after FBI agents entered the residence, ostensibly so the agents could test the telephone. (Filing 18, Rawalt Decl. ¶¶ 9–10.)

(b) After the FBI agents tested the phone, Carol Cole received a telephone call from a third party, (Filing 27, C. Cole Decl. ¶ 4), and made a call to the family's attorney, Steve Herman. (*Id.*, ¶ 5.)

(c) The Cole family was instructed by Rawalt that they could not interfere with the search. (Filing 18, Rawalt Decl. ¶ 9.) Mrs. Cole and her oldest daughter remained in the living room throughout most of the search, while the two younger children returned to their bedroom sometime during the search. (Filing 27, C. Cole Decl. ¶ 8; Herman Decl. ¶ 6.) Cole was interviewed by Rawalt on the steps of the family home. (Filing 27, Cole Decl. ¶¶ 22j–22k.)

(d) Steve Herman, the family lawyer, was allowed to come to the Cole residence, arriving at about 10:00 p.m., (Filing 27, Herman Decl. ¶ 4), and conferring privately with Cole. These conferences took place on the front porch of the Cole residence and in Herman's truck, which was parked in front of the residence. (Filing 27, Cole Decl. ¶ 13; Herman Decl. ¶ 7.) When not conferring with Her-

man or talking with Rawalt, Cole was in the living room of the residence. (Filing 27, Cole Decl. ¶ 9.)

(e) Herman examined the warrant and told Cole the warrant did indeed give the FBI the right to search his home. Herman advised Cole to cooperate with the FBI, which, according to Herman, he did. (Filing 27, Herman Decl. ¶¶ 4–7, 11.)

(f) Around midnight, according to Herman's best recollection, Rawalt asked Cole and Herman to tour the house to inspect for any damage; the three men inspected the house and found no damage. Cole acknowledged to Rawalt that there was no damage, and, with Cole's permission, Rawalt and at least one other agent proceeded to search the garage and Cole's car. According to Herman, these searches took between 25 and 40 minutes. (Filing 27, Herman Decl. ¶¶ 7–9.)

(g) Herman remained at the Cole residence from the time of his arrival at approximately 10:00 p.m. until the search of Cole's residence ended, whereupon Cole and Herman drove to the CTC building in Herman's truck. (Filing 27, Herman Decl. ¶¶ 4–11.)

(h) Rawalt swore that at "no time" did he "receive any complaints from any of the Cole family or their attorney, Mr. Herman, that the Cole family was being mistreated, held against their will, or denied access to their living space." (Filing 18, Rawalt Decl. ¶ 14.) In a specific reference to this statement, Cole did not deny the truth of Rawalt's claim, but he added that "we were terrified, in a state of emotional trauma, confused, and yet still attempting in good faith to cooperate with the law enforcement personnel." (Filing 27, Cole Decl. ¶ 22r.)

29. The precise time the search of the Cole residence ended is in dispute, but it is undisputed that the search of the residence ended sometime between approximately 11:45 p.m., as estimated by Rawalt, (Filing 18, Rawalt Decl. ¶ 12), and "close to 1:00 a.m.," as estimated by Cole. (Filing 27, Cole Decl. ¶ 15.)

30. Sometime in the very early morning hours after the search of the CTC offices began, a CTC assistant manager told FBI agents he had located the source of the tone

heard on Zak's phone. (Filing 27, L.S. Cole [4] Decl. ¶¶ 12–18.)

31. According to the CTC assistant manager, the tone was produced by what he described as a "bad card," located in the CTC offices, that operated a subscriber carrier field unit located near Zak's home. (*Id.*) [5]

32. When the "bad card" was located, the tone apparently produced by the "bad card" was audible to someone using the telephone. (Filing 27, L.S. Cole Decl. ¶ 17 ("When the Texas agent answered, the noise was back again.").) According to the assistant manager, CTC had "always had noise problems with it." [6] (Filing 27, L.S. Cole Decl. ¶ 10.)

33. By removing and then reinserting the "bad card," the assistant manager was able to establish to his satisfaction that the card had caused the malfunction of the subscriber carrier unit. (*Id.*, ¶ 17.) The "bad card" was removed by the FBI and sent to its laboratory. (Filing 27, Cole Decl. ¶ 26c.) The evidence does not reveal what, if any, tests were subsequently conducted by the FBI regarding the "bad card," but Defendants do not now dispute that the "bad card" caused the subscriber carrier unit to produce the suspect tone. (Filing 18, Howen Decl. ¶ 9; Filing 30, Howen Decl. ¶ 1.)

34. A subscriber carrier unit such as the one involved in this case is used by telephone companies to avoid having to install additional phone lines. (Filing 27, Cole Decl. ¶ 23d.) Such equipment is customarily used when it is anticipated that there will be significant growth in a neighborhood. (Filing 30, Howen Decl. ¶ 2.)

35. Subscriber carrier units are in use all over the United States, (Filing 27, Brooks Decl. ¶ 7), although they are generally used in areas of dense population or rapid growth. (Filing 30, Howen Decl. ¶ 2.) Howen stated

under oath, and his statement has not been controverted, that it would be unusual to find such equipment at CTC:

> Based upon my training and experience, the use of carrier equipment at the Curtis Telephone Company would be unusual since this equipment is generally used in areas where there is dense population or there has been more rapid growth than is present in that particular area of Curtis. In fact, during my conversations with the plaintiff, Eddie Cole, he indicated that the only reason that carrier equipment was utilized in the neighborhood in question was due to the fact that it had been anticipated that there would be significant growth in that specific neighborhood which had not in fact occurred.

(Filing 30, Howen Decl. ¶ 2.)

36. The Zak residence is in a rural area, and the subscriber carrier unit is visible from the gravel driveway that runs in front of the Zak home. (Filing 27, Cole Decl., attached Exs. K–N.)

37. The tone recorded by Zak using the FBI tape recorder, which tone was evidently produced by the subscriber carrier unit and the "bad card," would not under normal circumstances be heard by a person using the telephone. (Filing 27, Brooks Decl. ¶ 5; Filing 30, Howen Decl. ¶ 1.)

38. The tone Howen heard on the tapes submitted to him in Washington, D.C., was "present when the telephone receiver was picked up during rings and when it was picked up between rings." (Filing 30, Howen Decl. ¶ 3.)

## II. APPLICATION OF LAW TO CAUSES OF ACTION AND FACTS

I turn next to the seven causes of action alleged by Plaintiffs, the defenses asserted

---

4. Despite the similarity of their names, plaintiff Eddie L. Cole and the assistant manager of CTC are not related.

5. The "bad card" itself was located in the offices of CTC, (Filing 27, L.S. Cole Decl. (*compare* ¶¶ 12–14 *with* ¶¶ 15–17)), but it operated a terminal near the Zak residence. (*Id.*)

6. Indeed, attached to Cole's declaration are various examples of this (or a similar) problem experienced by CTC from time to time. These problems are variously described as "when answer phone it makes a funny noise," (Filing 27, Cole Decl., Ex. Q), and "howling on line." (*Id.*, Ex. R.) In fact, Cole advises that "when the cards deteriorate, the noise may become audible on the line longer, i.e., after the receiver reaches the customer's ear, and complaints will then be generated, requiring replacement of the worn out part." (Filing 27, Cole Decl. ¶ 23e.)

by Defendants, and the material undisputed facts. I shall first examine each cause of action separately to determine whether the causes of action set forth in the amended complaint [7] state a claim upon which relief can be granted and whether summary judgment should be granted on the merits of the undisputed material facts, assuming the complaint can be construed to state a claim. Second, with regard to the constitutional tort allegations, I shall also examine the question of whether Defendants have qualified immunity from suit.

## A. First Cause of Action: The Search Warrant Application

Plaintiffs claim in their first cause of action that Rawalt made misstatements and omissions in a search-warrant application and Howen made negligent statements that were incorporated in the search-warrant application, resulting in an unlawful search of the Cole residence in violation of the Fourth Amendment, such violation being a Constitutional tort redressable under the doctrine announced in *Bivens*. (Filing 12 1st Am. Compl. ¶¶ 42–48.)

■ Plaintiffs' first cause of action claims a violation of the Fourth Amendment under the precepts of *Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72, 98 S.Ct. 2674, 2676–77, 2684–85, 57 L.Ed.2d 667 (1978).[8] (*See* Pls.' Br. at 11–14.) In that case, the Supreme Court held that the Fourth Amendment is violated when a search warrant is issued upon an affidavit containing a falsehood, if three things are established:

(1) A statement included in an affidavit for search warrant was in fact false. 2 Wayne

R. LaFave, *Search and Seizure* § 4.4(d), at 201 (1987).

(2) Either (a) the statement was deliberately made with knowledge of its falsehood, or (b) the statement was made with reckless disregard of the truth. *Id.* at 201–02.

(3) The false statement was material; that is, without the false statement the affidavit fails to establish probable cause for the issuance of the warrant. *Id.* § 4.4(c), at 197. The Supreme Court made clear in *Franks* that allegations of "negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.

*Franks* covered statements that are either untrue as a matter of fact or contain omissions that render the statements false when viewed from the perspective of the judge who is reviewing the search-warrant application. 2 Wayne R. LaFave, *Search and Seizure* § 4.4(b), at 194–95 & nn. 43, 44 (citing, among other cases, *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980)). In this case, Plaintiffs claim that "material misstatements and omissions" were made, as opposed to statements that were literally untrue. (Filing 12 1st Am.Compl. ¶¶ 45–47.)

When dealing with omissions, it is important to remember that a police officer "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir.1990). Rather, *Franks* only "protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate." *Id.* at 301 (emphasis in original) (citing *United*

---

7. Plaintiffs' brief is much more specific than the amended complaint regarding the exact nature of Plaintiffs' claims; it is obviously the amended complaint to which the motion is directed. However, as indicated in the text, I have also examined whether the complaint could be amended to cure some inadvertent pleading problem, and if amended, whether the complaint would survive a motion for summary judgment.

8. *Franks* was decided in the context of determining whether and when a criminal defendant may be entitled to an evidentiary hearing to challenge a search warrant affidavit. However, in setting out the parameters of whether and when a crimi-

nal defendant would be entitled to such a hearing, the Supreme Court necessarily articulated what would constitute a Fourth Amendment violation. Indeed, the Court explicitly stated that if the criminal defendant proved the three elements set forth in the text, the defendant would be entitled to suppression of evidence on Fourth Amendment grounds. *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676–77. If a Fourth Amendment violation is proved in the criminal context when these three elements are proved, it follows that a similar violation proves a Fourth Amendment violation for civil litigation purposes. Defendants do not dispute this point.

*States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986)).

■ Still further, where it is claimed that the officer was "reckless," it is normally inappropriate to try prove "reckless disregard" based upon the content of the omitted information alone. *Colkley,* 899 F.2d at 301. It is only proper to infer recklessness from an omission alone where the omitted material was "clearly critical" or amounted to "flagrant police conduct." *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986).

■ Even a deliberate lie or reckless disregard of the truth is not enough; it must also be established that the "supplemented warrant" (the warrant affidavit or application considered in light of the omitted material) "*could not* have supported the existence of probable cause." *Id.* at 962 (emphasis in original). Thus, even when important information is withheld, and one might therefore be able to infer a deliberate lie or reckless disregard of the truth, a Fourth Amendment violation is not proved if the affidavit, as corrected, would still have supported the existence of probable cause. *Id.*

With these factors in mind, I turn to the specifics of Plaintiffs' complaint regarding individual defendants.

### 1. Howen

■ With regard to Howen, Plaintiffs' first cause of action fails to state a claim under *Franks v. Delaware* and Fed.R.Civ.P. 12(b)(6) for two distinct reasons.

First, there is no pleading (or proof) that anything in the search-warrant affidavit attributable to Howen was in fact false.[9] The only allegation regarding Howen in the complaint's first cause of action is that Rawalt

included in the search-warrant affidavit "the negligent analysis and conclusions made by Defendant Howen." (Filing 12 1st Am. Compl. ¶ 45(b).) Nowhere does the complaint allege that Howen's conclusions, which were included in the affidavit, were false.

The search warrant affidavit stated: "He [Howen] further advised that his knowledge and data available through the Radio Engineering Division indicates that the 300 hz tone is not generated by telephone switching or 'home office' equipment and is therefore from an outside interference source." (Filing 18, Ex. A ¶ 18.) There is no evidence whatever that this statement was false. On the contrary, all the evidence establishes that the statement was true.

Plaintiffs' expert in this case agrees that nothing in the telephone switching equipment or "home office" equipment would generate a tone in the range of 300 to 400 hertz and that such a frequency is "foreign" to telephone switching and home office equipment. (Filing 27, Brooks Decl. ¶ 6.) Plaintiffs' expert stated in pertinent part: "In Paragraph 18 of SSA Howen's affidavit, he stated that 300 hertz was a foreign frequency not found in switching or home office equipment, (only one-half of the communications system) *which is correct;* however, Seiscor carrier equipment uses 300–400 hertz frequencies." (*Id.* (emphasis added).) Thus, what was attributable to Howen in the affidavit was literally true: The tone was not generated by telephone switching or home office equipment but was produced, in the words of Plaintiffs' expert, by a "frequency" which was "foreign" to that equipment[10] or, to quote Rawalt relying on Howen, by an "outside

---

**9.** *Franks* applies to a case in which one government agent knowingly or recklessly misrepresented information to a second agent who innocently included the misrepresentation in a search-warrant affidavit. 2 Wayne R. LaFave, *Search and Seizure* § 4.4(b), at 192 & n. 36 (citing *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)).

**10.** Although Plaintiffs do not make a significant point of it, they may disagree with their expert that the frequency was "foreign" to telephone switching and "home office" equipment. Plaintiffs suggest that a 300–hertz tone was approved

by the Rural Electrification Administration as a reference tone for "our ESC–3 . . . a part of that central office unit." (Filing 27, Cole Decl. ¶ 23d.) This point is made only briefly in one sentence of Cole's declaration and is not developed further. Except for this isolated and unexplained reference, all the evidence, including the declaration of Plaintiffs' expert, points in one direction: Frequencies in the ranges of 300 to 400 hertz are foreign *if* subscriber carrier equipment is not being used. Accordingly, there is no "genuine" dispute about this point.

interference source."[11]

Second, even if one could characterize what was attributable to Howen in the search-warrant affidavit as false—for example, by arguing that the use of the words "outside interference" was misleading because the source of the interference was produced by telephone company equipment, although not telephone company switching equipment or "home office" equipment—there is no claim (or proof) that Howen's statements were deliberate falsehoods or made with reckless disregard for the truth.

Plaintiffs have suggested (and their proof shows) no more than that (a) Howen was not aware of the presence of a subscriber carrier field terminal situated off site near the Zak residence, and (b) Howen was not aware such a unit could malfunction and cause an audible tone to be heard by someone using the telephone, This lack of knowledge on the part of an engineer located in Washington, D.C., cannot fairly be stretched to establish that Howen lied or acted so recklessly that his conduct was equivalent to a lie.

Indeed, the undisputed evidence establishes that carrier equipment of this kind, while not unusual generally, would not be expected to be found in rural Nebraska. Such equipment is used primarily in areas where there is a large population or where it is anticipated there will be rapid population growth. Howen stated under oath, and his statement has not been controverted, that:

> Based upon my training and experience, the use of carrier equipment at the Curtis Telephone Company would be unusual since this equipment is generally used in areas where there is dense population or there has been more rapid growth than is present in that particular area of Curtis. In fact, during my conversations with the plaintiff, Eddie Cole, he indicated that the only reason that carrier equipment was utilized in the neighborhood in question was due to the fact that it had been anticipated that there would be significant growth in that specific neighborhood which had not in fact occurred.

(Filing 30, Howen Decl. ¶ 2.)

Plaintiffs mention in passing in their brief that certain statements in the first declaration Howen filed with the court in this case are misleading or incorrect. (Pls.' Br. at 21–22.) Plaintiffs evidently make this point to attack Howen's credibility, implying that if he erred in declarations filed in this court, he must also have erred when advising Rawalt. Plaintiffs make two points: (a) although the unusual tone was not present during calls initiated by Zak, Howen's first declaration states that he was advised by another technically trained agent of the "presence of unknown noises or tones on telephone lines during telephone calls *made by* victims ...," (Filing 18, Howen Decl. ¶ 4 (emphasis added)), and (b) the tones were not unusual, as Howen suggested in his declaration, (*id.,* ¶ 5), since subscriber carrier equipment normally produces tones of the type found by Howen. I do not agree that Howen's declarations are misleading or incorrect on these points.

With regard to the first point, Howen specifically stated in a supplemental declaration that the sounds he heard on the tape were present when the telephone receiver was picked up during rings and when it was picked up between rings. (Filing 30, Howen Supplemental Decl. ¶ 3.) Thus, Howen clarified any possible misunderstanding. More importantly, however, the statement attributable to him regarding phone calls "made by" victims is Howen's report of what he was told by another technically trained agent, and is given simply as background. Still further, the "made-by" statement in Howen's first declaration was not misleading because, when read in context, it is not an attempt to

---

**11.** Plaintiffs note that Howen initially measured the frequency at 300 hertz, as opposed to their expert's measurement of 328 hertz. However, this difference is immaterial for, among other reasons, that even if the subscriber carrier unit was performing correctly, it would produce a frequency in the range of 330 hertz, *plus or minus* 10 percent. (Filing 30, Howen Decl. ¶ 1.) Whether the measurement was 300 hertz or 328 hertz is irrelevant because Howen's measurement was in the range of frequencies that might be expected *if* one realized that subscriber carrier equipment was being used. Indeed, Plaintiffs' expert attributes no significance to the difference in measurements, (Filing 27, Brooks Decl. ¶ 6), since this equipment normally produces frequencies in the ranges found by *both* Plaintiffs' expert and Howen.

differentiate between the person who initiated the call and the person who received the call. Rather, when read in context, the phrase "made by" means "participated in." Finally, the relevant question is not who initiated the call, but whether the tone was present when it should not have been. The fact that the tone was present only when a call was received does not disprove the possibility of an illegal wiretap. Consequently, I conclude that the declaration Howen filed in this court was not misleading or incorrect on this point in any way.

As to the second point—that subscriber carrier equipment normally produces tones like the one isolated by Howen and, therefore, Howen should not have described the tone as unusual—contrary to Plaintiffs' assertion, the undisputed evidence indicates that the tone on the phone was in fact "unusual," as Howen stated. The tone was unusual in the sense that it was audible to the human ear when it should not have been heard by a human being. Indeed, everyone agrees that the tone should not have been audible by the time the telephone receiver reached the listener's ear. (Filing 27, Brooks Decl. ¶ 5; Pt. I, Finding 32.) Yet the evidence reveals that the tone heard on Zak's line was in fact audible under normal circumstances after it should have ended. (*Id.*) Even the assistant manager of CTC stated in

a sworn declaration that CTC had "always had noise problems" with this equipment. (*Id.*)[12] Thus, I do not believe Howen's declaration was inaccurate or misleading on this point in any way.

Finally, given the undisputed material facts I found in Part I, it is obvious that Plaintiffs cannot in good faith amend their complaint to show either that what was attributable to Howen in the affidavit was false, or if false, that the statements were deliberately made by Howen with knowledge of their falsehood or in reckless disregard of the truth. Accordingly, there is no reason to give Plaintiffs leave to amend their complaint.[13]

## 2. Rawalt

■ After examining the first cause of action from Rawalt's perspective, I conclude that the first cause of action also fails to state a claim against Rawalt under *Franks* and Fed.R.Civ.P. 12(b)(6). Likewise, I conclude that given the undisputed facts found earlier, Plaintiffs cannot in good faith amend their complaint to state a valid constitutional tort claim against Rawalt. Assuming for the sake of argument that Rawalt's affidavit contained omissions of fact, the complaint does not allege, and Plaintiffs' proof does not show,[14] that the statements attributable to Rawalt were made deliberately with knowledge of

---

**12.** Plaintiffs' expert, (Filing 27, Brooks Decl.), does *not* state that the tone produced by the card the expert tested was *not* audible to a human ear if a standard phone was picked up between or during rings. In fact, there is no indication in the expert's declaration that he tested the card using a normal telephone and a human being. In any event, the undisputed evidence is that on the night in question, the tone was audible and present when it should not have been. As indicated in the text, this was a recurrent "noise problem." Furthermore, since it is an undisputed fact that the tone was present *between rings* on the tape Howen tested, it is also clear that the tone Howen isolated was "unusual." Indeed, Plaintiffs' expert explicitly states that the tone "is not a defect nor a problem *since it only occurs when the phone is answered during the ringing process.*" (Filing 27, Brooks Decl. ¶ 5 (emphasis added).) Therefore, since the tone was present *between* rings, not only during rings, it is obvious that Howen isolated an unusual problem when he examined the tape. I also note that Cole, like his expert, also incorrectly assumed that the noise on Zak's line was "*only* present if the call

is answered *while the telephone is ringing.*" (Filing 27, Cole Decl. ¶ 21c.) Finally, I point out that even Cole admits noises sufficient to generate customer complaints may be present when a card fails: "When the cards deteriorate, the noise may become audible on the line longer, i.e., after the receiver reaches the customer's ear, and complaints will then be generated, requiring replacement of the worn out part." (*Id.* ¶ 23e.) Simply put, there is no question that the noise was "unusual."

**13.** If for some reason it were to be concluded that the complaint did or could state a claim which would survive a motion under Fed. R.Civ.P. 12(b)(6), I also grant Defendants' alternative motion for summary judgment for the reasons stated in the text.

**14.** Once again, if the complaint could be construed in such a way as to survive a motion to dismiss, I grant Defendants' motion, treated as a motion for summary judgment, for the reasons stated in the text.

their falsity or recklessly in disregard of the truth.

Plaintiffs' complaint alleges that Rawalt made four material misstatements or omissions in the search-warrant affidavit: (a) he misstated Howen's qualifications; (b) he included the negligent analysis and conclusion made by Howen; (c) he failed to adequately explain the extent of the animosity that Zak and Farrar bore toward Cole; and (d) he failed to reveal to the judge certain unspecified information known to him that would have negated allegedly suspicious activity on Cole's part. (Filing 12, ¶ 45(a)–(d).)

### (a)

With regard to the alleged misstatement of Howen's qualifications, Plaintiffs believe Howen had no experience with subscriber carrier equipment and therefore lacked the necessary qualifications to conduct the type of analysis he conducted. (Pls.' Br. at 18–19.) Assuming the factual predicate for this argument, there is no claim or proof that Rawalt was aware of Howen's lack of knowledge, or that if aware of this alleged deficiency, he would have considered it important.[15]

### (b)

With regard to Rawalt's inclusion of Howen's allegedly faulty analysis in the search-warrant application, there is no claim or evidence that Rawalt had any reason to disbelieve the accuracy of Howen's conclusions. Indeed, as pointed out above, Howen's analysis was literally correct: the tone was not generated by telephone switching or "home office" equipment, and the tone was "foreign" to that equipment.

To the extent Plaintiffs complain that Rawalt did not tell Howen of the existence of the field subscriber carrier unit situated on or near Zak's driveway, (Pls.' Br. at 29–30), there is no pleading or evidence to suggest that Rawalt, who had no specialized training, recognized the significance of the equipment and intentionally withheld the information or recklessly failed to recognize the significance of the equipment.

Still further, I have examined pictures of the equipment, and while it is true that the equipment is visible from the highway near Zak's residence, there are no markings on the equipment to indicate to a lay person that it is telephone equipment as opposed to some other type of utility equipment. (Filing 27, Cole Decl.Exs. K–N.) Moreover, even if Rawalt had recognized the equipment as belonging to the telephone company, there is no pleading or evidence to show that he would have understood the potential significance of that equipment compared to other telephone company equipment.

### (c)

With regard to Rawalt's alleged failure to fully describe the animosity Zak and Farrar felt for Cole, there is no pleading or evidence that Rawalt believed anything other than what he put in the affidavit. The affidavit clearly set forth evidence of a serious dispute among Cole, Zak, and Farrar, which evidence would have alerted the judge to the possibility that Zak and Farrar were lying. In fact, Rawalt specifically told the judge there was a "personalty conflict" among Cole and the two women that resulted in the termination of their employment at CTC and that after an appeal, the women had obtained unemployment benefits from CTC. (Filing 18, Ex. A ¶ 2.) There is no pleading or evidence to suggest that Rawalt believed the statements he made were untrue or that he was otherwise reckless in relaying to the judge the

---

15. As noted earlier, I am willing to assume that one agent cannot lie to another agent and then shield himself from liability by claiming that the innocent agent made the misstatements. In this case, there is no claim or pleading that Howen should be held liable for misstating his qualifications; however, even if that were the claim against Howen, such a claim would fail for two reasons. First, the alleged misstatement—that Howen was not experienced with subscriber carrier units situated in the field—is not material. The undisputed facts are that Howen was educated as an electrical engineer; he had received specific training in telephone repair from a large east coast telephone company; and he had many years' experience dealing with wiretaps as both a technically trained agent and a supervisory agent. This being true, it is inconceivable that the judge would have declined to issue the search warrant had she known the alleged truth. Second, there is simply no evidence that Howen had any reason to doubt his qualifications; therefore, there is no basis for concluding that Howen deliberately misrepresented his qualifications or did so recklessly without proper regard for the truth.

situation that existed among Cole and the alleged victims.

### (d)

The last alleged "misstatement" is the most general: Plaintiffs allege that Rawalt failed to reveal to the judge certain information known to him that would have negated certain allegedly suspicious activity on Cole's part, which activity was described in the affidavit. This allegation of one or more unspecified "omissions" is obviously too general to survive a Rule 12(b)(6) motion, and no further comment would normally be warranted.

In their brief, however, Plaintiffs endeavor to make their very general claim more specific. (Pls.' Br. at 23–32.) Essentially, Plaintiffs make the following points:

1. Rawalt should not have used the phrase "tapping noise" or "electronic tapping noise" in the search-warrant affidavit because people associated with CTC would not have so characterized the noise.

2. Rawalt should not have described Cole's slow trip by auto past Farrar's residence and place of employment on April 30, 1992, because (a) in Curtis, Nebraska, it would have been difficult not to make a similar trip no matter what the real purpose of the trip was; (b) at least part of the road was rough, accounting for Cole's slowness; and (c) Rawalt knew that Cole ultimately obtained a fishing pole as a part of the trip.

3. Rawalt failed to explain precisely when the noise was heard or not heard; that is, Rawalt should have explained that the noise was not heard when a call was placed by Zak and that the noise was only heard when the phone was answered while still ringing.

4. Rawalt should not have recounted that Cole asked the sheriff to trace a license plate, and in the process told the sheriff that Farrar and Zak were suing him, because (a) it should have been apparent to Rawalt that Farrar and Zak (or their husbands) would have publicly discussed the fictitious suit; and (b) Cole told the sheriff that a CTC employee had seen someone in the car trying to photograph the CTC building and thus there was nothing suspicious about the fact

that Cole knew of the suit or was endeavoring to trace a license plate.

5. Rawalt did not accurately inform the judge about what Farrar told him respecting Cole's statement that he would be willing to spend $100,000 to fight Zak and Farrar because the recounted statement is not consistent with what Farrar told a hearing examiner in an unemployment compensation hearing.

6. Rawalt should have told the judge that Howen stated to him that a wiretap "could not be eliminated" as a possible source of the tone since that is what Howen indicates he told Rawalt at the time.

I shall examine each of these alleged omissions to determine whether, if they were alleged in the amended complaint, they would survive a Rule 12(b)(6) motion measured against the *Franks* standard.

### (i)

With regard to the claim that Rawalt should not have used the phrase "tapping noise" or "electronic tapping noise" in the search-warrant affidavit because people associated with CTC would not have so characterized the noise, I find and conclude that this claim is irrelevant and clearly fails to establish that Rawalt deliberately lied or recklessly disregarded the truth.

Rawalt did not use the phrase "tapping noise" or "electronic tapping noise" as descriptions of his opinion but rather as a description of what Zak thought the noise was. The phrase is first used in the following context: "On January 17, 1992 Carol Zak noticed unusual electronic noises (tapping noises) on her telephone line at the inception of a call received." (Filing 18, Rawalt Decl., Ex. A ¶ 3.) Thus, it is clear that the words to which Cole objects were used to describe the noise Zak heard on January 17, 1992, and thereafter. The conclusion about "tapping noises" was Zak's and it was clearly expressed to the judge as such. There is no pleading or evidence to suggest that Rawalt disbelieved Zak or that Rawalt was reckless with the truth when he told the judge Zak's conclusion about what she thought the noise was.

More to the point, as Rawalt indicated by placing them in parentheses after the words "unusual electronic noise," the words "tapping noise" and the like were intended as nothing more than a shorthand description of the "unusual electronic noise" first heard by Zak on January 17, 1992. When the term is repeated in the affidavit thereafter, it is clear that the words are used to mean "unusual electronic noise." And the term "unusual electronic noise" is not false or misleading because everyone agrees that Zak should not have been able to hear noise, whatever its source. Thus, there is no reason to believe Rawalt thought the words "tapping noise" and the like, defined as "unusual electronic noise," were false or that he used the words in reckless disregard of the truth.

### (ii)

Plaintiffs next argue that Rawalt should not have described Cole's slow trip by auto past Farrar's residence and place of employment on April 30, 1992, because (a) in Curtis, Nebraska, it would have been difficult not to make a similar trip no matter what the real purpose of the trip was; (b) at least part of the road was rough, accounting for Cole's slowness; and (c) Rawalt knew that Cole ultimately obtained a fishing pole as a part of the trip. Even if this information is true, there is nothing to suggest that Rawalt intended to lie or recklessly disregard the truth by omitting the information.

Rawalt's search-warrant affidavit recited the following:

On April 30, 1992, a physical surveillance was instituted by the agents of the FBI to establish Eddie Cole's presence at the time tapping noises were present on Carol Zak's home telephone. Eddie Cole, Jr. was surveilled from his office to his residence at approximately 4:59 p.m. At 6:01 p.m., a telephone call was received at the Zak residence and the electronic tapping noises were present. At 6:35 p.m. Eddie Cole was observed leaving his residence and driving to the employment of Joleen Farrar and also driving in front of and behind the residence of Jolene Farrar. Cole was observed to slow down and closely observe those locations.

(Filing 18, Rawalt Decl., Ex. A ¶ 11.)

Cole does not dispute the truthfulness of Rawalt's recitation in the affidavit. Indeed, he essentially admits what Rawalt said was true. (Filing 27, Cole Decl. ¶ 21f.) Cole's complaint is that he thinks that if Rawalt was going to make the statement, he should also have added that Curtis is a small town; virtually any trip would have taken Cole on the route he followed; part of the road was rough, accounting for the slowness of the drive; and Cole had a lawful purpose for the drive, i.e., the retrieval of a fishing pole.

Assuming that everything Cole complains about is factually accurate, such an assumption in no way suggests that Rawalt knowingly lied or recklessly disregarded the truth. The pertinent part of the recitation was that Cole was at home when the strange noises were heard on Zak's phone, and shortly thereafter, Cole slowly drove by Farrar's home and place of employment.

It is perfectly obvious from Rawalt's statement that Cole might have had a legitimate reason for the drive, slow or otherwise. But it is also perfectly obvious that Cole might have had an illegitimate reason for the trip as well. The fact that Curtis is small and has rough roads and that Cole picked up a fishing pole does not make the trip any less suspicious *given its timing*. Had Rawalt added these facts, the suspicious nature of the drive shortly after the call to Zak's home would still have existed. Thus, there is simply no basis to conclude that Rawalt deliberately lied or was acting in reckless disregard of the truth when he made the statements in the affidavit.

Cole thinks it particularly significant that during the search at the CTC office building, Rawalt acknowledged that he knew Cole had picked up a fishing pole during the above-described trip. I am willing to assume Rawalt knew that Cole retrieved a fishing pole at some point during the trip. However, I do not believe this establishes anything of significance.

Cole evidently believes Rawalt's knowledge of the fact that he retrieved a fishing pole

somehow suggests that Rawalt knew Cole's trip was harmless. I do not think this conclusion logically follows from the facts. Rawalt could well have believed (and evidently did believe) that even if Cole ostensibly had a legitimate reason for the trip, given the timing of the trip, retrieval of a fishing pole was a pretext for surveillance of Farrar, an afterthought after surveillance of Farrar, or simply one of various reasons for the trip, including surveillance of Farrar. The fact remains that Cole had the opportunity to observe Farrar no matter what other purposes might also have motivated the trip. Simply put, Rawalt's knowledge of the fishing pole does not remotely suggest that Rawalt was deliberately lying or acting in reckless disregard of the truth when he made the statements about which Plaintiffs now complain.

### (iii)

Plaintiffs further argue that Rawalt failed to explain precisely when the noise was heard or not heard; that is, Rawalt should have explained that the noise was not heard when a call was placed by Zak and that the noise was only heard when the phone was answered while still ringing. Once again, there is no pleading or evidence to suggest that Rawalt deliberately lied or recklessly disregarded the truth when he made statements in the search-warrant affidavit about when the unusual electronic noise was heard. A number of observations are pertinent to this claim.

Rawalt clearly did not mislead the judge since he never represented in the affidavit that the tone was present when a call was initiated by Zak. (Filing 18, Rawalt Decl., Ex. A.) On the contrary, Rawalt was very specific on at least four occasions that the tone was present when a call was *received* by Zak. (*Id.*, ¶ 3 ("Zak noticed unusual electronic noises ... at the inception of a call received."); ¶ 9 ("Farrar telephonically contacted Carol Zak ... and the ... noises were present."); ¶ 10 ("Zak received a telephone call ... which had electronic tapping noises present."); ¶ 11 ("A telephone call was received at the Zak residence and the electronic tapping noises were present.").)

Moreover, there is no pleading or evidence that Rawalt, who was not technically trained,

should have recognized the significance of the fact that the tone was heard only when a call was received. In fact, the evidence reveals that it was only after many hours of investigation that the CTC assistant manager and Howen were able to ascertain the true nature of the problem.

Also, it is not true, as Plaintiffs assume, that the tone was heard only when the phone was picked up while still ringing. Howen specifically stated in his supplemental declaration that the tone was "present both when the telephone receiver was picked up during rings and when it was picked up between rings." (Filing 30, Howen Decl. ¶ 3.) No one has controverted this point. Accordingly, the factual predicate for Plaintiffs' argument in this regard is entirely lacking.

### (iv)

Plaintiffs next contend that Rawalt should not have recounted that Cole asked the sheriff to trace a license plate, and in the process told the sheriff that Farrar and Zak were suing him, because it should have been apparent to Rawalt that Farrar and Zak (or their husbands) would have publicly discussed the fictitious suit. Thus, Plaintiffs argue, there was nothing suspicious about the fact that Cole knew of a potential suit or was endeavoring to trace the license plate of a car that had been used to photograph the CTC building. Once again, I do not believe this information suggests in any way that Rawalt deliberately lied or acted in reckless disregard of the truth.

Rawalt informed the judge who was considering the search-warrant application that:

On May 4, 1992, Sheriff Lanny Roblee, Frontier County, Curtis, Nebraska, advised the affiant that on May 1, 1992, Eddie Cole, Jr. requested Roblee to trace a license number observed at Carol Zak's residence on April 30, 1992. Cole said that an employee of his, Roger Bryant, lives next door to Zak and obtained the license for Cole. This license is assigned to a vehicle utilized by the FBI. A suitable pretext was subsequently furnished to Eddie Cole, Jr. by Sheriff Roblee per the affiant's request. During both conversations Cole had with Sheriff Roblee, Cole

advised that he was being sued by Carol Zak and Joleen Farrar. Both Carol Zak and Joleen Farrar advised that they have not discussed this fictitious suit with anyone other than their respective husbands, who were at times party to telephone conversations. Roger Farrar and Ed Zak have advised the affiant that they have not discussed the fictitious suit with anyone other than their respective wives.

(Filing 18, Rawalt Decl., Ex. A ¶ 12.)

Cole admits that he talked to the sheriff, that he contacted the sheriff because he feared a lawsuit and wanted to know who was operating a particular car because he was concerned that the operator might be a private investigator hired by Zak and Farrar, and that he asked the sheriff to trace the vehicle's license plate. (Filing 27, Cole Decl. ¶ 21g.)

Cole argues, however, that he told Sheriff Roblee the reason he wanted the license plate traced was because his lawyer had told him to ask the sheriff to do so because a person in the vehicle seen at Zak's residence was also observed by a CTC employee photographing CTC. (*Id.*) Moreover, Cole points out that he and his lawyer suspected that CTC would be sued by Zak and Farrar because of the previous disagreement, and Cole and his lawyer wanted to find out if the car at Zak's residence, also seen being used by a person who photographed CTC, was owned by a private investigator hired by the two women. (*Id.*) Cole states that he never told the sheriff he was being sued by the women. (*Id.*)

Once again, there is no reason to believe that Rawalt did not accurately recite what Sheriff Roblee told him. Moreover, both Zak and Farrar stated under oath that what they told Rawalt about not publicly discussing the fictitious suit (and other things) was accurately recited by Rawalt in the search-warrant affidavit. (Filing 30, Zak Decl.; Farrar Decl.)

Even if one assumes that Roblee, Zak, Farrar, or the spouses of the two women lied to Rawalt about this incident, Rawalt simply has no liability for accurately reciting what he was told, absent some very strong reason to doubt the statements these people made to him. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684 ("The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant."); *United States v. Luschen*, 614 F.2d 1164, 1172 (8th Cir.), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); 2 Wayne R. LaFave, *Search and Seizure* § 4.4(b), at 191 & n. 34 (collecting cases), § 4.4(d), at 204 (in criminal context, defendant's proof that "the informant lied to the officer ... would not effect the validity of the warrant ...").

There is no pleading or evidence [16] that Rawalt was aware of specific facts that should have caused him to doubt the statements made to him about this incident by Roblee, Zak, Farrar, and the spouses of the two women. Consequently, there is no reason to believe that Rawalt deliberately lied or recklessly disregarded the truth when he recounted the incident involving the sheriff, the fictitious lawsuit, and Cole's desire to have the license plate traced.

### (v)

Plaintiffs next assert that Rawalt did not accurately inform the judge about what Farrar told him concerning Cole's statement that he would be willing to spend $100,000 to fight Zak and Farrar. (Filing 18, Rawalt Decl., Ex. A ¶ 14.) Cole comes to this conclusion because the recounted statement described by Rawalt in the search-warrant affidavit is not consistent with what Farrar told a hearing examiner during an unemployment compensation hearing. As noted earlier, however, this type of evidence proves nothing because even if Farrar gave inconsistent statements, there is no pleading or evidence to suggest that Rawalt had reason to disbelieve

---

16. For example, Cole points out that he has evidence that Roger Farrar, husband of Jolene Farrar, publicly mentioned the possibility of suit on two occasions, (Filing 27, Cole Decl. ¶ 21g; L.S. Cole Decl. ¶¶ 20–24), and Cole argues he thus had good reason to fear a suit. Neverthe-

less, there is no showing that Rawalt was aware of Mr. Farrar's public discussion of the possibility of suit. On the contrary, Rawalt stated under oath that Mr. Farrar told him there was no public discussion of the possibility of a lawsuit.

her. Moreover, as noted above, Farrar specifically swore under oath that what Rawalt recited in the search-warrant affidavit accurately represented what she told him. (Filing 30, Farrar Decl.) Thus, there is no basis whatever to conclude that Rawalt deliberately lied or recklessly disregarded the truth when he recounted Farrar's version of this event.

### (vi)

Plaintiffs next argue that Rawalt should have told the judge Howen stated to him that a wiretap "could not be eliminated" as a possible source of the tone since that is what Howen now indicates he told Rawalt at the time the search-warrant affidavit was drafted. (Filing 18, Howen Decl. ¶ 6.) Cole argues there is a material difference between Howen's simply telling Rawalt that a wiretap "could not be eliminated," and the statement in Rawalt's search-warrant affidavit that "the 300 hz tone is not generated by telephone switching or 'home office' equipment and is therefore from an outside interference source." (Filing 18, Rawalt Decl., Ex. A ¶ 18.)

However, there is no inconsistency between what Howen now states he told Rawalt and what Rawalt reported he was told in the search-warrant affidavit. Howen specifically swore that he "reviewed SA Rawalt's affidavit in support of the search warrant affidavit for Eddie Cole's residence and have determined that the affidavit accurately describes the information I provided SA Rawalt." (Filing 18, Howen Decl. ¶ 7.)

Moreover, if what Rawalt stated in the search-warrant affidavit was accurate, as Howen affirmed, then the words "and a wiretap could not be eliminated as a possible source of the tone" are simply not important. If those words were added to what Rawalt stated in the affidavit, the affidavit, as supplemented, would read: "The 300 hz tone is not generated by telephone switching or 'home office' equipment and is therefore from an outside interference source. *A wiretap could not be eliminated as a possible source of the tone.*"

Nowhere in the affidavit, and certainly not in the plain language of the words "outside interference source," did Rawalt suggest that

the precise source of the tone was known by Howen to be a wiretap. Since Rawalt did not represent that Howen knew the precise source of the tone was a wiretap, there was no reason for Rawalt to qualify the statement further. Thus, I do not believe this "omission" suggests in any way that Rawalt deliberately lied or acted in reckless disregard of the truth in this respect.

### 3. Unknown Agents

■ Although Plaintiffs name "Five Unknown FBI Agents" as defendants in their first cause of action, there are no specific allegations made against these unknown agents regarding the first cause of action. Moreover, there is no proof suggesting that the complaint could in good faith be amended to make specific allegations against such defendants. Accordingly, Defendants' motion to dismiss and for summary judgment shall be granted as to the "Five Unknown FBI Agents." *See, e.g., Black v. United States,* 534 F.2d 524, 528 (2d Cir.1976) (allegation in an ambiguous complaint against various unknown IRS agents was insufficient to state a constitutional claim due to a lack of specificity as to what they did or failed to do).

### 4. Qualified Immunity

■ Qualified immunity shields government officials, such as law enforcement officers, who act within the scope of their duties from suit for monetary damages in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ The Supreme Court has stressed that a police officer is entitled to qualified immunity under the Fourth Amendment unless a reasonable police officer would have known that his or her conduct violated clearly established law.

In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), monetary damages were sought against an FBI agent for conducting a warrantless search of the plaintiff's home in violation of the Fourth

Amendment. The FBI agent conducted the search because he believed, albeit erroneously, that a bank robber might be found in the home. The district court granted summary judgment for the agent, holding that he had probable cause to search the home and that his failure to obtain a warrant was justified by exigent circumstances. The United States Court of Appeals for the Eighth Circuit reversed on appeal, holding that there were unresolved factual disputes as to the existence of probable cause and exigent circumstances. The court of appeals also held that the agent was not entitled to qualified immunity because the right allegedly violated—the right to be free from a warrantless search absent probable cause and exigent circumstances—was clearly established.

The Supreme Court reversed the decision of the court of appeals, stating that in order to defeat a defense of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand *that what he is doing violates that right.*" *Id.* at 640, 107 S.Ct. at 3039 (emphasis added). The "relevant question" then "is the objective (albeit fact specific) question" of "whether a reasonable officer could have believed [the FBI agent's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.* at 641, 107 S.Ct. at 3040. The FBI agent's "subjective beliefs about the search are irrelevant." *Id.* Accordingly, the Court reversed and remanded.[17] *See also Malley v. Briggs,* 475 U.S. 335, 345–46, 106 S.Ct. 1092, 1098–99, 89 L.Ed.2d 271 (1986) (applying "objective reasonableness" test to a warrant situation and holding that a police officer will be subject to

liability only "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized").

■ Applying the defense of qualified immunity to the first cause of action, I find and conclude, based upon the material undisputed facts set forth in Part I of this opinion as applied to the *Franks* standard discussed above, a standard clearly established at the time of the search-warrant affidavit, that a reasonable FBI agent would *not* have known that his or her conduct violated clearly established law by submitting, or participating in the submission of, the search-warrant affidavit in this case. I arrived at this conclusion for the reasons articulated in Part IIA(1)–(3) above. Accordingly, Defendants are entitled to qualified immunity regarding the first cause of action.

### B. Second Cause of Action: Unlawful Execution of Search Warrant

I now turn my attention to Plaintiffs' second cause of action claiming that Rawalt, Howen, and the five unknown FBI agents executed the search warrant in an unreasonable manner by (a) conducting the search until the early morning hours when the search was limited to execution during the day; (b) "arresting" Plaintiffs without probable cause; and (c) otherwise executing the warrant in an "uncalled-for manner" in violation of the Fourth and Fifth Amendments, such violation being a constitutional tort redressable under the doctrine announced in *Bivens.* (Filing 12 ¶¶ 49–58).

---

17. The Court acknowledged that limited discovery should be allowed in certain cases where there is a factual dispute about what the law enforcement officer actually did. *Id.* at 646–47 n. 6, 107 S.Ct. at 3042. While there has been no formal discovery in this case, there has also been no showing pursuant to Fed.R.Civ.P. 56(f) that without discovery Plaintiffs are unable to controvert the facts asserted by Defendants regarding the defense of qualified immunity. Plaintiffs have requested and been given extensions of time to submit their brief and affidavits. (Filings 19, 22.) In fact, Plaintiffs have filed voluminous affidavits setting forth what they believe happened in this case from a factual point of view.

(Filing 27.) No order precluding discovery has been issued by this court. Plaintiffs have requested, (Filing 31), that the discovery meeting required by Fed.R.Civ.P. 26(f) be postponed until after this court has ruled on Defendants' motion, and the magistrate judge has granted Plaintiffs' request. (Filing 33.) Accordingly, I recognize that where a defendant asserts the defense of qualified immunity by making factual allegations regarding his or her conduct, the plaintiff "bears the burden of going beyond the allegations of his pleading and coming forward with evidence establishing a genuine dispute [about the alleged wrongful conduct]." *Howard v. Suskie,* 26 F.3d 84, 87 (8th Cir.1994).

■ Law enforcement officers may have liability for a constitutional tort if they execute a search warrant in an unreasonable manner. *Hummel–Jones v. Strope*, 25 F.3d 647, 650–51 (8th Cir.1994) (search by warrant of birthing clinic at 2 a.m. during which visitors, who were not suspected of illegal activity, were rousted from bed, photographed, and ordered to stay on couch in waiting room for more than three hours was unreasonable, where the warrant was based upon suspicion of practicing medicine without a license). *See also* 3 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 10.04[A], at 10–25 & n. 12 (1992) (collecting cases) ("If a search otherwise justified is carried out in an unreasonable fashion, liability may attach.") (citations omitted).

■ Liability of this type flows from the Fourth Amendment and is normally analyzed from the Fourth Amendment perspective of whether the conduct was "objectively reasonable," as opposed to some generalized "due process" standard. *Graham v. Connor*, 490 U.S. 386, 392–99, 109 S.Ct. 1865, 1869–74, 104 L.Ed.2d 443 (1989) (all claims that law enforcement officials used excessive force in course of a "seizure" of a free citizen are properly analyzed under the Fourth Amendment's "objective reasonableness" standard rather than under a substantive due process standard); *Maryland v. Garrison*, 480 U.S. 79, 86–89, 107 S.Ct. 1013, 1017–19, 94 L.Ed.2d 72 (1987) (Fourth Amendment is not violated by the mistaken execution of a valid search warrant on the wrong premises where the conduct of the law enforcement officials was "objectively reasonable"). *See also Dalia v. United States*, 441 U.S. 238, 256–57, 99 S.Ct. 1682, 1692–93, 60 L.Ed.2d 177 (1979) (it is generally left to the discretion of the executing officers how best to proceed with the performance of a search authorized by a warrant, subject to the general Fourth Amendment protection against unreasonable searches and seizures).

■ In order to prove that the conduct of law enforcement officers violated the Fourth Amendment, a civil-rights plaintiff must plead and prove that from the perspective of a reasonable police officer on the scene, without regard to the actual intent or motivation of the defendants, the conduct was not "objectively reasonable." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1871–73. *See also Turner v. White*, 980 F.2d 1180, 1182 (8th Cir. 1992).

With these factors in mind, I turn to the second cause of action with regard to Howen, Rawalt, and the Five Unknown FBI Agents.

### 1. Howen

■ The undisputed facts, including Plaintiffs' evidence, fail to show that Howen did anything at the Cole residence, with the possible exception of being there during part of the search.[18] Assuming for the sake of argument that Howen was present during the search of Cole's residence, there is nothing about his mere presence that is "objectively unreasonable," given that the FBI agents possessed a valid search warrant. Accordingly, although the amended complaint may state a claim against Howen under Fed.R.Civ.P. 12(b)(6), the undisputed facts show that summary judgment must be granted in favor of Howen regarding the second cause of action since at most the evidence reveals only that Howen was present at the Cole residence.

### 2. Rawalt

#### (a)

■ The first allegation against Rawalt in the second cause of action is that he continued the search beyond the time specified in the warrant. The search started at about 9:38 p.m. and ended somewhere between 11:45 p.m. and 1:00 a.m. Plaintiffs contend that the search was unreasonable because the warrant limited the time in which the search could be conducted; that is, the search was limited to "daylight" hours between 6:00 a.m. and 10:00 p.m. Since the search extended beyond 10:00 p.m., Plaintiffs contend that it was unreasonable.

---

**18.** Whether Howen was at the Cole residence when the search was conducted is a matter of dispute. Howen swore he was not present at the Cole residence, although he admitted being present at the CTC offices. (Filing 18, Howen Decl. ¶¶ 8–9.) Cole thinks he saw Howen at his home. (Filing 27, Cole Decl. ¶ 23f.)

There is no doubt that (a) the search warrant was limited as to the time it could be executed, i.e., between 6:00 a.m. and 10:00 p.m.; (b) the search was started before 10:00 p.m.; and (c) the search extended beyond 10:00 p.m., but not later than 1:00 a.m. While I conclude that the first part of Plaintiffs' second cause of action would survive a motion to dismiss, based upon the undisputed material facts found in Part I above, I conclude that summary judgment should be granted on this portion of the second cause of action. I arrived at this conclusion for the following reasons.

■ First, provided that search-warrant execution is begun within the time specified by the warrant, a search that extends beyond the deadline does not violate the Fourth Amendment (or Fed.R.Crim.P. 41) unless it is unreasonable to stay past the prescribed time. *United States v. Young,* 877 F.2d 1099, 1104–05 (1st Cir.1989) (Breyer, J., then a United States circuit judge, now associate justice of the Supreme Court) (collecting cases) (search conducted through Sunday and Monday nights). *See also United States v. Schoenheit,* 856 F.2d 74, 77 (8th Cir.1988); *United States v. Burgard,* 551 F.2d 190, 193 (8th Cir.1977). This is believed to be the appropriate result because (a) the reason for the time limitation in the first place is to stop intrusions during the dead of night while people are sleeping, and if the intrusion takes place in the "daytime" (as defined by the warrant), the reason for the limitation has been satisfied; and (b) interrupting a search to wait for the passage of night frequently increases, rather than diminishes, inconvenience to residents by extending the total time during which their home is subject to police intrusion.

Second, I find no evidence here that would have caused an objectively reasonable FBI agent to leave Cole's premises at 10:00 p.m. or that would cause a reasonable agent to conclude that the officer was acting unreasonably by staying past 10:00 p.m. The major disturbance caused by the execution of the search warrant had already taken place by 10:00 p.m. Moreover, Cole's lawyer, Steve Herman, was on the scene advising Cole to cooperate, which he did, according to

Herman. Still further, the younger Cole children were allowed to return to their bedrooms to sleep. Also, Rawalt received no complaints from the Cole family or from Herman, their lawyer, that extending the search beyond 10:00 p.m. was causing any undue difficulty. Indeed, Herman, who arrived at about 10:00 p.m., examined the warrant, advised Cole that the FBI had the authority to conduct the search, and further advised Cole to cooperate in the search.

Third, I believe Rawalt's motives for choosing to execute the search warrant 22 minutes before the deadline are irrelevant. According to the express terms of the warrant, Rawalt had the authority to begin executing the search warrant *prior* to 10:00 p.m. The Supreme Court has made it clear that "objective reasonableness" does not turn on the motives of the law enforcement officers, whether good or bad. Rather, "objective reasonableness" turns on whether a hypothetical reasonable officer would have believed the challenged action was reasonable. *Graham,* 490 U.S at 397, 109 S.Ct. at 1872–73. It is obviously objectively reasonable to execute a warrant during the time period expressly authorized in the warrant. This is particularly true in this case because Rawalt had prior information that the suspected wiretap was activated when Cole was at home. (Pt. I, Finding 12, ¶ 11.) Thus, Rawalt had objectively reasonable grounds to execute the warrant either early in the morning before Cole left for work or later in the evening after Cole returned home. Rawalt's personal motivation for executing the search warrant at 9:38 p.m., as opposed to some other time, is simply not material as to the question before me.

Fourth, even if I assume that Rawalt had an improper motive for starting execution of the search warrant at 9:38 p.m., Rawalt's continued presence on the scene after 10:00 p.m. was objectively reasonable. The Cole family, and their lawyer, voiced absolutely no complaints about continuing the search beyond 10:00 p.m. Indeed, the undisputed evidence is that the Cole family was instructed by their lawyer to cooperate with the FBI agents, and the family did in fact cooperate. Thus, Rawalt's initial motivation for starting

the search at 9:38 p.m., even if assumed to be bad,[19] does not render the continued search past 10:00 p.m. objectively unreasonable because the Cole family and their lawyer implicitly agreed that the search could continue.

### (b)

■ I turn next to the second part[20] of the Plaintiffs' second cause of action involving their claim that Rawalt "arrested" them. As previously indicated, what Rawalt *said* to the Cole family is disputed. Rawalt contends that he told the family they were free to leave, that no one was under arrest, that they could use the telephone after the FBI agents tested it, and that they could move to other parts of the house in the company of the agents, but that the family could not interfere with the execution of the search warrant. (Filing 18, Rawalt Decl. ¶ 9.) Cole and his wife, on the other hand, contend "we were told to stay seated or we would be 'taken away.'" (Filing 27, Cole Decl. ¶ 22h; C. Cole Decl. ¶ 3.)

I assume that the second part of the second cause of action would survive a motion to dismiss. However, I believe that summary judgment must be granted on the merits because while there may have been a "seizure" of the Cole family, it was reasonable as a matter of law.

First, it is proper to analyze Plaintiffs' "arrest" claim in terms of the Fourth Amendment standard regarding seizures. It is the Fourth Amendment that "also protects the 'right of the people to be secure in their persons'...." 2 Wayne R. LaFave, *Search and Seizure* § 5.1, at 387 (1987) (footnote omitted).

Second, if I assume that what Plaintiffs claim they were told is true, i.e., that they were told "stay seated or you will be taken away," I must also assume for purposes of the motion for summary judgment that

Plaintiffs were "seized." If this statement was made, a finder of fact could believe that a reasonable person would have concluded he or she was not "'at liberty to ignore the police presence and go about [their] business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)). Since this belief would have been the product of "police conduct," a finder of fact could also conclude that the Cole family was indeed "seized" for Fourth Amendment purposes. *Id.*

Third, even if the Cole family was "seized," a finder of fact would still be required to determine that the seizure was unreasonable before Plaintiffs could win. Since 1980 police officers have been permitted to detain occupants of a home during the execution of a search for contraband, even without probable cause, until the search has been completed provided the detention does not last an unreasonable period of time and is not otherwise unreasonable. *Michigan v. Summers*, 452 U.S. 692, 694–705, 101 S.Ct. 2587, 2589–96, 69 L.Ed.2d 340 (1981) (holding that detention of occupants of a home was justified even though it was a Fourth Amendment seizure without probable cause where warrant authorized search for "contraband"). This rule applies to all "occupants" who are residents of the home. 2 Wayne R. LaFave, *Search and Seizure* § 4.9(e), at 309.

Assuming that the warrant in this case did not authorize a search for "contraband," as Defendants apparently concede, (Defs.' Br.Supp.Mot.Dismiss or Summ.J. at 22–23),[21] I am nevertheless persuaded that the "seizure" of the Cole family was objectively reasonable. Here, the detention (a) was directed at a criminal suspect and the occupants of the home in which the criminal suspect resid-

---

**19.** Such an assumption is a bit of a stretch. Rawalt's stated reasons for beginning the search when he did are clearly facially reasonable. Moreover, there is no evidence whatever that Rawalt had any prior dealings with Cole or his family from which some animus might be inferred.

**20.** The second part of Plaintiffs' second cause of action is essentially identical to Plaintiffs' Fourth

Cause of Action. I shall therefore incorporate this discussion into my discussion of the Fourth Cause of Action.

**21.** This concession may be generous as the question of what constitutes "contraband," "evidence," or "criminal instrumentalities" is not easily answered. 2 Wayne R. LaFave, *Search and Seizure* §§ 4.6(b)–(e), at 243–257.

ed; (b) did not extend beyond the period of the search; and (c) was otherwise reasonable, i.e., it did nothing more than prohibit the occupants of the home from interfering with the search. *United States v. Ritchie*, 35 F.3d 1477, 1483 (10th Cir.1994) (even though warrant did not specifically authorize search for contraband, but rather sought "evidence," *Summers* was properly applied where search executed at residence of person directly implicated in the suspected crime and the detention was otherwise reasonable); *United States v. Rowe*, 694 F.Supp. 1420, 1423–25 (N.D.Cal.1988) (detention of apartment occupant during execution of a search warrant for escaped prisoner, as well as evidence relating to the escape, was permissible given occupant's close association with prisoner and detention was otherwise reasonable).

Giving Plaintiffs the benefit of the doubt, the detention in this case lasted no longer than 3 hours, 22 minutes, and much less if Rawalt is to be believed. (Pt. I, Finding 29.) The detention lasted no longer than it took to search the residence. The detention was quite limited, it was otherwise reasonable, and the Cole family and their lawyer made no contemporaneous complaints about their treatment. (Pt. I, Findings 17–28.) In this connection, I specifically note that:

(a) The Cole family was allowed to use the telephone in their home after FBI agents tested the phone. (Filing 18, Rawalt Decl. ¶¶ 9–10.)

(b) After the agents had tested the phone, Carol Cole received a telephone call from a third party, (Filing 27, C. Cole Decl. ¶ 4), and made a call to the family's attorney, Steve Herman. (*Id.*, ¶ 5.)

(c) The Cole family was instructed by Rawalt that they could not interfere with the search, (Filing 18, Rawalt Decl. ¶ 9), but Mrs. Cole and her oldest daughter were allowed to remain in the living room throughout most of the search, and the two younger children were allowed to return to their bedroom sometime during the search. (Filing 27, C. Cole Decl. ¶ 8; Herman Decl. ¶ 6.) Indeed, when the search warrant was first executed, FBI agents did not require the 10–year–olds to leave their bedroom. (Filing 27, C. Cole Decl. ¶ 2.) Still further, during the initial stage of the execution of the warrant, a male and female agent were paired together to reduce, if not eliminate, undue embarrassment to the female occupants of the home. (Filing 18, Rawalt Decl. ¶ 7.) Cole was interviewed by Rawalt on the steps of the family home, (Filing 27, Cole Decl. ¶¶ 22j–22k), but as subsequently discussed, the interview was consensual and Rawalt engaged in no abusive conduct. (Pt. IIB2c(ii).)

(d) Steve Herman, the family lawyer, was allowed to come to the Cole residence, arriving shortly after the warrant was first served, (Filing 27, Herman Decl. ¶ 4), and conferring privately with Cole. These conferences took place on the front porch of the Cole residence and in Herman's truck, which was parked in front of the residence. (Filing 27, Cole Decl. ¶ 13; Herman Decl. ¶ 7.) When not conferring with Herman or talking with Rawalt, Cole was with his family in the living room of the residence. (Filing 27, Cole Decl. ¶ 9.)

(e) Herman examined the warrant and told Cole the warrant did indeed give the FBI the right to search his home. Herman advised Cole to cooperate with the FBI, which, according to Herman, he did. (Filing 27, Herman Decl. ¶¶ 4–7, 11.)

(f) Around midnight, according to Herman's best recollection, Rawalt asked Cole and Herman to tour the house to inspect for any damage; the three men inspected the house and found no damage. Cole acknowledged to Rawalt that there was no damage, and the search proceeded outside the living quarters. (Filing 27, Herman Decl. ¶¶ 7–9.)

(g) Herman stayed at the Cole residence from the time he arrived at approximately 10:00 p.m. until the search of Cole's premises ended, whereupon Cole and Herman drove to the CTC building in Herman's truck. (Filing 27, Herman Decl. ¶¶ 4–11.)

(h) Rawalt swore that at "no time" did he "receive any complaints from any of the Cole family or their attorney, Mr. Herman, that the Cole family was being mistreated, held against their will, or denied access to their living space." (Filing 18, Rawalt Decl. ¶ 14.) In a specific reference to this statement, Cole

did not deny the truth of Rawalt's claim. (Filing 27, Cole Decl. ¶ 22r.)

### (c)

██ I now turn to the third prong of Plaintiffs' second cause of action, i.e., that Rawalt executed the search warrant in "an uncalled-for" manner. I conclude that this portion of Plaintiffs' complaint fails to state a claim upon which relief can be granted and that summary judgment should be granted regarding this claim.

The allegation that the search warrant was executed in an "uncalled-for manner" is simply too general to survive a motion under Fed.R.Civ.P. 12(b)(6). *See Dalia*, 441 U.S. at 256–57, 99 S.Ct. at 1692–93. This is particularly true here where a nonparty law enforcement officer, who did not participate in but was present to observe the search, opined: "The execution of the search warrant was the smoothest, and least emotional that I have ever seen. All Agents acted in an extremely professional manner throughout the search." (Filing 18, Douglas Decl. ¶ 4.)

Normally, no further discussion would be called for, but Plaintiffs attempt to shore up this generalized claim in their brief. I turn next to the points mentioned in that brief.

Plaintiffs argue that Rawalt "stormed into" the Cole home and "interrogated" Cole. When analyzed in relation to the undisputed facts, neither of these assertions will support a claim that Rawalt acted in an objectively unreasonable manner in the way he executed the search warrant.

### (i)

With regard to the "storming" of the Cole residence, Cole admits he did not answer the door and that he was asleep on the living room couch immediately prior to the knocks on his door. (Filing 27, Cole Decl. ¶ 5.) It is undisputed that Rawalt knocked a number of times before entering the home, and it is undisputed that Cole's minor daughter answered the door. (*Id.*) Rawalt specifically asserted that he executed the warrant in compliance with the federal "knock-and-announce" statute. (Filing 18, Rawalt Decl. ¶ 8.) Nowhere does Cole or any other member of the family deny this assertion. Indeed, Plaintiffs make no claim in the amended complaint or their brief that Rawalt violated the "knock-and-announce" statute. *See* 18 U.S.C. § 3109.[22] Moreover, Cole admits that as Rawalt entered the house and confronted Cole, who was in the living room adjacent to the door, Rawalt immediately and loudly informed Cole of his presence and purpose. (Filing 27, Cole Decl. ¶ 5.) Deputy Sheriff Douglas, who is not a party to this action and did not participate in the search, has stated: "When the door was opened, Special Agent Rawalt, other Agents and I proceeded in a calm orderly fashion into the residence." (Filing 18, Douglas Decl. ¶ 2.) Cole does not challenge Douglas on this point except to say that Douglas might not have seen everything that happened because Douglas admits he did not see who answered the door. (Filing 27, Cole Decl. ¶ 24a.)

Under these circumstances, it is beyond dispute that Rawalt acted in an objectively reasonable manner in entering the Cole resi-

---

**22.** Cole suggests that Rawalt pushed the door as his daughter opened it and that Rawalt "proceeded to brush past her without any introduction or invitation." (Filing 27, Cole Decl. ¶ 22e.) But Plaintiffs neither elaborate on the significance of this point nor claim, either in the amended complaint or in their brief, that section 3109 was violated as a consequence. Nowhere does any Plaintiff deny Rawalt's specific assertion that he complied with the federal "knock-and-announce" statute. In any event, the question in this case is whether the Constitution was violated, not whether section 3109 might have been violated. Thus, the test is whether the agents acted in an "objectively reasonable manner," not whether they technically complied with the federal "knock-and-announce" statute.

While section 3109 clearly constitutes a useful guide to Fourth Amendment values, it, and other statutes like it, are no more than a guide. *Ker v. California*, 374 U.S. 23, 39, 83 S.Ct. 1623, 1632–33, 10 L.Ed.2d 726 (1963) (despite the fact that entry might not comply with section 3109, since a state prosecution was at issue, the question was "governed by constitutional standards"). Indeed, at least one court has held that section 3109 does not create a private right of action independent of a claim under the Fourth Amendment. *Rivera v. United States*, 728 F.Supp. 250, 263 (S.D.N.Y.1990), *rev'd in part on other grounds*, 928 F.2d 592 (2d Cir.1991). Accordingly, it is unnecessary to address section 3109 further.

dence. The entry was reasonable under the Fourth Amendment because it was made (a) without violence; (b) without destruction of property; and (c) with due regard for the privacy interests of the occupants. After an announcement at the door, notice of the presence and purpose of the FBI was given to the first adult the agents confronted immediately after they walked through the door, which door was either opened or partially opened by the minor child who answered it. Thus, all Fourth Amendment values were observed by Rawalt when he made the warranted entry into the Cole residence. *See, e.g.,* 2 Wayne R. LaFave, *Search and Seizure* § 4.8(b), at 272 ("The constitutional requirement of announcement serves a number of most worthwhile purposes (i) 'decreasing the potential for violence'; (ii) 'protection of privacy'; and (iii) 'preventing the physical destruction of property.'") (footnote omitted).

### (ii)

Cole also argues that the way Rawalt executed the warrant was unreasonable because Rawalt "interrogated" him. The undisputed evidence establishes that Rawalt questioned Cole on the front steps of the house, but Cole makes no claim that he or his family were threatened or abused by Rawalt during the "interrogation." (*Compare* Filing 18, Rawalt Decl. ¶ 11 *with* Filing 27, Cole Decl. ¶¶ 12–13.) Moreover, Cole makes no claim that he ever asked to terminate the "interrogation" and that Rawalt refused. (Filing 27, Cole Decl. ¶¶ 12–13; 22j–22l.) Still further, Cole admits that he was "attempting in good faith to cooperate with the law enforcement personnel." (*Id.,* ¶ 22r.) The Frontier County deputy sheriff swore there were no threats or shouts during the interview:

> Some time during the execution of the search warrant at the Cole residence, Special Agent Rawalt, accompanied by Eddie Cole, left the residence and stood on the front steps of the house. They were approximately five to six feet from me, just outside the storm door. I could not hear much of the conversation between Special Agent Rawalt and Eddie Cole, but I did not hear any screaming or shouting, nor any threats by Special Agent Rawalt to Eddie Cole. A short time after Special

> Agent Rawalt and Eddie Cole went to the front steps, Steven Herman, an attorney, arrived at the residence and remained on the premises for the duration of the search.

(Filing 18, Douglas Decl. ¶ 5.)

Cole does not controvert the deputy sheriff's testimony in this regard except to note that he thinks the deputy left the residence sometime before midnight. (Filing 27, Cole Decl. ¶ 24b.) It is undisputed that Herman, Cole's lawyer, arrived shortly after Cole began talking with Rawalt and thereafter Cole conferred privately with Herman, both on the porch and in Herman's truck. (Filing 27, Cole Decl. ¶ 13; Herman Decl. ¶¶ 4–7.) It is further undisputed that Herman remained at the Cole residence, fully able to confer with Cole at all times, throughout the remainder of the search of the residence. (Filing 27, Herman Decl. ¶¶ 4–10.) While it is unclear how long the "interrogation" lasted, it is clear that it ended before the search. (*Id.*)

Under these circumstances, and quite apart from the separate, but related, question of whether Cole was "seized," Rawalt's conduct in "interrogating" Cole while executing the search warrant was indisputably "objectively reasonable" as it was consensual and free from abusive conduct. *Florida v. Bostick,* 501 U.S. at 435, 111 S.Ct. at 2386 ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual … as long as the police do not convey a message that compliance with their request is required.") (citations omitted).

### 3. Unknown Agents

 The claim against the unknown FBI agents in Plaintiffs' second cause of action is quite similar to the claim against Rawalt. Consequently, the resolution of the claim against the agents is the same as for the claim against Rawalt, and further discussion of the reasons is unnecessary.

There are three factual elements, however, in the second cause of action that are unique to the five unknown agents. The Cole family asserts that these agents (1) ran through the house after entering it, (Filing 27, Cole Decl.

¶ 24a); (2) proceeded to the bedroom of the two 10–year–old girls and shined their flashlights into the room, thus frightening the children, (Filing 27, C. Cole Decl. ¶ 2); and (3) entered the bedroom where Mrs. Cole was undressing without knocking. (*Id.*). I shall briefly consider each of these claims.

I assume for purposes of the motion that after the initial entry by Rawalt, other agents ran to various parts of the home. However, there is nothing objectively unreasonable in this conduct. The search warrant gave the agents the right to search the entire house, (Filing 18, Rawalt Decl.Ex. B), and proceeding quickly to secure the house after the initial entry is not only clearly reasonable, but also appropriate to avoid the possibility of conflict with other residents of the home.

With regard to the fact, and I assume for purposes of the motion that it is a fact, that some of the agents shined a light in the 10–year–old girls' bedroom and the children were frightened as a result, once again there is nothing objectively unreasonable about this conduct given the fact that the warrant was for the entire house.

Moreover, three other undisputed facts should be noted in this regard. Mrs. Cole observed that when she went to the girls' bedroom, the bedroom door was closed, the children were in their beds, and the light was off. (Filing 27, C. Cole Decl. ¶ 2.) Thus, it is apparent that the agents did their best not to unduly disturb the children when they checked the bedroom. Moreover, Mrs. Cole was not restrained from going to the girls' bedroom, talking with the girls, and then taking them with her to the living room. (*Id.*) Finally, the children were allowed to return to their bedroom as the search proceeded.[23] (*Id.*)

■ Next, Mrs. Cole was understandably upset by the fact that a male and female agent entered her bedroom without knocking and found her nude from the waist up. This fact is undisputed. Terribly unfortunate though it was, however, I do not believe the agents' conduct was objectively unreasonable. As previously noted, the agents had the right to search the entire home. Moreover, the agents were paired by gender (one male and one female) as they secured the house precisely to reduce, if not eliminate, undue embarrassment to the family. Rawalt swore that he chose a female agent for this very purpose. (Filing 18, Rawalt Decl. ¶ 7 ("I also asked a female FBI Special Agent to be present to ensure Cole's wife and children were given proper attention.").) Still further, once the agents had entered the residence, no Fourth Amendment principle required them to knock on the home's inner doors before entering a room. 2 Wayne R. LaFave, *Search and Seizure* § 4.8(c), at 279 ("Thus, police executing a search warrant for a house, once they have gained lawful entry into the house, need not again state their authority and purpose prior to the entry of each individual room in that house.") (footnote omitted). *See also United States v. Remigio*, 767 F.2d 730, 732 n. 2 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985).

Since "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant," *Dalia*, 441 U.S. at 257, 99 S.Ct. at 1693, and on the undisputed facts of this case there is nothing objectively unreasonable about the particular actions asserted against the unknown FBI agents regarding the manner in which they executed the search warrant, the motion for summary judgment on the merits will be granted on these points as well.

### 4. Qualified Immunity

■ Applying the defense of qualified immunity to the first part of Plaintiffs' second cause of action, I find and conclude based upon the material undisputed facts set forth in Part I of this opinion, as applied to the standard in *United States v. Young*, 877 F.2d at 1104–05, a standard clearly established at the time of the execution of the search warrant in this case, that a reasonable FBI agent would not have known that his or her

---

**23.** Indeed, Rawalt swore that he requested the children be put to bed. (Filing 18, Rawalt Decl. ¶ 11.) Cole denies that *he* was asked to put the children to bed, but he does not deny that Rawalt generally asked that the children be put to bed. (Filing 27, Cole Decl. ¶ 22k.)

conduct violated clearly established law by starting the execution of the search warrant before 10:00 p.m. and continuing the search thereafter. I reached this conclusion for the reasons articulated in Part IIB2(a) above. Accordingly, Defendants are entitled to qualified immunity regarding the first portion of Plaintiffs' second cause of action because the agents acted in an objectively reasonable manner.

▮ I also conclude that Defendants are entitled to qualified immunity as to the second portion of Plaintiffs' second cause of action regarding the "arrest" of the Cole family. I reached this conclusion for the following reasons.

Since the warrant did not authorize a search for "contraband" (at least as that word is often interpreted), it is arguable that *Summers* would not apply in this case. However, both before, *United States v. Rowe,* 694 F.Supp. at 1420, 1423–25, and after, *United States v. Ritchie,* 35 F.3d at 1477, 1483, the events of this case, other courts have held that *Summers* applies to a noncontraband warrant where the place to be searched is occupied by a criminal suspect (or someone closely related to the suspect) and the detention is otherwise reasonable. Cole was clearly a suspect, and his family resided with him. Consequently, a reasonable police officer could have concluded that *Summers* applied to this case.

Indeed, *prior* to the events of this case, one appeals court held that agents of the Bureau of Alcohol, Tobacco & Firearms (ATF) were entitled to qualified immunity under *Summers* where they executed a warrant for evidence and detained a suspect for 2 hours and 45 minutes. *Daniel v. Taylor,* 808 F.2d 1401, 1403–05 (11th Cir.1986) (refusing to determine whether *Michigan v. Summers* applied because the warrant authorized a search for evidence, but finding that ATF agents had qualified immunity under *Summers* where they detained a proprietor of a business for 2 hours and 45 minutes during search of business premises).

In order for Plaintiffs to overcome the defense of qualified immunity, they must persuade me that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. Even if I assume as a matter of fact that at one point the Cole family was told "stay seated or you will be taken away," such detention was justified by a good-faith application of *Michigan v. Summers,* even if *Summers* does not explicitly authorize such detention because the warrant was not for contraband.

Giving Plaintiffs the benefit of the doubt, the detention in this case lasted no longer than 3 hours, 22 minutes, and much less if Rawalt is to be believed. (Pt. I, Finding 29.) The detention was quite limited, it was otherwise reasonable, and the Cole family and their lawyer made no contemporaneous complaints about their treatment. (Pt. I, Findings 17–28.) Under these circumstances, and considering, but not repeating, the discussion in Part IIB2(b) above, use of *Michigan v. Summers* is entirely appropriate as a foundation for qualified immunity regarding the second part of Plaintiffs' second cause of action. The contours of the law were simply not sufficiently clear to apprise a reasonable agent that his or her conduct, even if it amounted to a "seizure," violated clearly established law. On the contrary, other courts have extended *Summers* to cases such as this.

▮ Applying the defense of qualified immunity to the third part of Plaintiffs' second cause of action, I find and conclude based upon the material undisputed facts set forth in Part I of this opinion, as applied to the standard in *Dalia v. United States,* 441 U.S. at 256–57, 99 S.Ct. at 1692–93 (and its progeny), a standard clearly established at the time of the execution of the search warrant in this case, that a reasonable FBI agent would not have known that his or her conduct violated clearly established law by executing the search warrant in the manner described in this case, as the agents acted in an objectively reasonable manner. I arrived at this conclusion for the reasons articulated in Pts. IIB2(c) & 3 above. Accordingly, Defendants are entitled to qualified immunity

regarding the third portion of the second cause of action.

### C. Third Cause of Action: Denial of Counsel

#### 1. Merits as to Rawalt and the Five Unknown Agents [24]

Plaintiffs' third cause of action is easily disposed of. It alleges that Plaintiffs were denied their right to consult with counsel because an unknown FBI agent told Mrs. Cole not to call the family lawyer. Given that I concluded earlier that there is a fact in dispute as to whether or not the family was "seized" for purposes of the Fourth Amendment, I am willing to assume that a Fourth Amendment violation might be proved if Defendants precluded Plaintiffs from consulting counsel because it is at least arguable that such a "seizure" would be unreasonable. *Michigan v. Summers,* 452 U.S. at 702 n. 15, 101 S.Ct. at 2594 n. 15 (holding that the Fourth Amendment was not violated by seizure of the occupants of a residence during a search warrant execution, in part because "the seizure in this case is not likely to have coercive aspects likely to induce self-incrimination"). *But see Warren v. City of Lincoln,* 864 F.2d 1436, 1442 (8th Cir.) (failure to give *Miranda* rights not actionable in civil-rights suit, *and* Sixth Amendment right to counsel did not attach as petitioner not subjected to adversary criminal proceeding), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989) (en banc). I am thus willing to assume that Plaintiffs' third cause of action would survive a Rule 12(b)(6) motion. However, the third cause of action will not survive the motion for summary judgment.

It is undisputed that Cole asked his wife to call the family attorney, (Filing 27, Cole Decl. ¶ 13), and that she did so. (Filing 27, C. Cole Decl. ¶ 5.) It is undisputed that the family attorney came to the residence, (Filing 27, Herman Decl. ¶¶ 3–4), and was given the opportunity to freely consult Cole and the family. (*Id.,* ¶¶ 6–7; Cole Decl. ¶ 13.) It is also undisputed that the attorney stayed throughout the search. (Filing 27, Herman

Decl. ¶¶ 4–10.) There is no claim that Rawalt participated in the alleged attempt to frustrate Mrs. Cole's call to the lawyer. Accordingly, summary judgment on the merits would normally be granted in favor of Defendants without further discussion. Two points merit brief attention, however.

First, Mrs. Cole suggests that an unknown female FBI agent told her not to call the family attorney. (Filing 27, C. Cole Decl. ¶ 5.) I assume for purposes of the motion for summary judgment that this is true. Mrs. Cole ignored the agent and called the attorney anyway. (*Id.*) There was no "harm" and, accordingly, no compensable "foul" insofar as the actions of the unknown female agent are concerned.

Second, Cole had no constitutional right to *Miranda* warnings, deprivation of which would allow him to recover money, even assuming he was "in custody" and "interrogated." *Miranda* warnings are procedural protections intended to safeguard the Fifth Amendment right to be free from self-incrimination. The consequences of the failure to give a *Miranda* advisement come into play only when Fifth Amendment self-incrimination provisions also come into play. The self-incrimination provisions of the Fifth Amendment were never implicated in this case because none of the plaintiffs were charged with a crime. When there is no criminal prosecution, as is the case here, there is also no civil remedy for failure to give *Miranda* warnings. *Warren v. City of Lincoln,* 864 F.2d at 1442. *See also Brock v. Logan County Sheriff's Dep't,* 3 F.3d 1215, 1217 (8th Cir.1993) ("The remedy for the alleged *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a civil rights action.").

### 2. Qualified Immunity

Rawalt would certainly be entitled to qualified immunity regarding Plaintiffs' third cause of action since it is not contended that he tried to prohibit anyone from calling the family attorney. He would have had no rea-

---

**24.** Plaintiffs conceded that Howen had no involvement in this cause of action. (Pls.' Br. at 18.)

son to believe his conduct violated *Summers,* even assuming there was a seizure. Moreover, if the claim against Rawalt is founded upon the assertion that he failed to advise Cole of his *Miranda* rights, then Rawalt is entitled to qualified immunity on the basis that it was not clearly established law that the failure to give *Miranda* warnings constituted a compensable constitutional violation. *Warren,* 864 F.2d at 1442.

As to the unknown female agent who allegedly told Mrs. Cole not to ask the family attorney to come to the home, the facts are in dispute about whether, and under what circumstances, the statement was made. Consequently, I cannot determine whether there is a basis for qualified immunity regarding the third cause of action insofar as the unknown female agent is concerned.

As to the remaining unknown agents, there is no allegation that they did anything to interfere with Mrs. Cole's efforts to call the family attorney, and there is no claim that they interrogated Cole. Accordingly, they would have had no reason to believe their conduct violated *Summers,* even assuming there was a seizure. The agents are thus entitled to qualified immunity.

### D. Fourth Cause of Action: Illegal Seizure

Plaintiffs' fourth cause of action pleads an unlawful seizure and is no different from the second part of the second cause of action. I shall therefore resolve the fourth cause of action in the same way I resolved the second part of the second cause of action: (1) summary judgment should be granted because even if the family was seized, the seizure was justified under *Summers;* and (2) Defendants would be entitled to qualified immunity on the seizure claim because it was not clearly established law that such a "seizure" was illegal under a good-faith application of *Summers.*

### E. Fifth Cause of Action: Tort Claim for False Imprisonment

■■■ Plaintiffs' fifth cause of action attempts to state a tort claim against the United States for false imprisonment. Under the provisions of 28 U.S.C. § 2680(h),[25] I am persuaded that the complaint states a claim that would survive a motion under Fed. R.Civ.P. 12(b)(6). However, the fifth cause of action will not survive Defendants' motion for summary judgment.

Plaintiffs claim they were falsely imprisoned when Rawalt and the FBI agents seized them during the execution of the search warrant at their residence. I assume the Cole family was "imprisoned" for the reason, articulated earlier, that a finder of fact could believe the family was "seized" for Fourth Amendment purposes.

Because the "imprisonment" in this case was authorized by a valid search warrant, when the warrant is read in light of *Summers,* Nebraska law bars recovery.[26] *Cimino v. Rosen,* 193 Neb. 162, 163, 225 N.W.2d 567, 569 (1975) (an action for false imprisonment will not lie where the imprisonment was pursuant to process that was regular, legal in form, and issued by a court of competent jurisdiction). The detention here, if there was any, was pursuant to process that, when read in light of *Summers,* allowed seizure of the occupants of the home. Since the process was otherwise regular, legal in form, and issued by a court of competent jurisdiction, Nebraska law does not permit recovery because although there has been an "imprisonment," there has been no "false imprisonment." Accordingly, the United States is entitled to summary judgment on Plaintiffs' fifth cause of action.

### F. Sixth Cause of Action: Intentional Infliction of Emotional Distress

■■■ Plaintiffs' sixth cause of action alleges a tort claim against the United States for intentional infliction of emotional distress. I assume that the amended complaint states a

---

25. Among other things, this provision of the FTCA expressly provides that the Act applies to any claim "arising out of . . . false imprisonment . . ." even though intentional torts are not normally covered by the FTCA.

26. "The substantive law of the place in which a cause of action accrues governs liability under the Federal Tort Claims Act with respect to both military and civilian employees." Daniel A. Morris, *Federal Tort Claims* § 2:2, at 7 (1993) (citations omitted).

claim, but even if the complaint could withstand a motion to dismiss, it will not withstand Defendants' motion for summary judgment.

Plaintiffs allege that "during the raid," Defendants "intentionally set out to frighten Plaintiffs into submission." (Filing 12, ¶ 78.) Plaintiffs endeavor to make this general allegation more specific in their brief, (Pls.' Br. at 56–57), by relying upon two statements, both allegedly uttered by Rawalt:

(1) Rawalt allegedly told Cole he should come to Omaha, Nebraska, for a polygraph examination or "I may just charge you with federal offenses on circumstantial evidence." (Filing 27, Cole Decl. ¶ 22p.)

(2) Rawalt allegedly told Cole after the raid that the subscriber carrier card was at "an FBI laboratory and if the report comes back right on it, it will be used as evidence against you, and federal charges will filed," to which Cole responded, "Does this mean the investigation is still active?", prompting Rawalt allegedly to reply, "It is not over until I get back the report, so yes." (Filing 27, Cole Decl. ¶ 26c.)

I assume for purposes of the motion for summary judgment that these statements were in fact made by Rawalt, that for Fourth Amendment purposes the Cole family was indeed "seized" during the execution of the search warrant, and that the undisputed facts set forth in Part I are true as a matter of fact. Nevertheless, Defendants' motion for summary judgment must be granted since the alleged conduct of Defendants was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." *Nebraska Jury Instructions (Second)* § 9.04 (1989) (*NJI2d* ) (setting forth the elements of the tort of intentional infliction of emotional distress under Nebraska law, and defining "outrageous" conduct).

The Nebraska Supreme Court has made it clear that summary judgment *must* be granted in favor of defendants in cases involving a claim of intentional infliction of emotional distress *unless* the alleged conduct *strictly* fits the definition of "outrageous" conduct set forth in section 9.04 of *NJI2d*. Compare *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993) (defendant who was driving a car involved in a motor vehicle accident engaged in "outrageous" conduct where driver dragged mortally injured victim from accident scene, leaving victim to die hidden in a ditch, and then called victim's mother and told her that victim had stolen the car, repeatedly denying knowledge of the whereabouts of the victim); *Dale v. Thomas Funeral Home, Inc.*, 237 Neb. 528, 466 N.W.2d 805 (1991) (holding that refusal by funeral home to release corpse until embalming bill was paid when wife of decedent sought to obtain a cheaper funeral from another funeral home, while demanding payment in cash and refusing to accept assignment of insurance policy that was payable in a sum greater than amount of bill, which policy was in possession of first funeral home, constituted outrageous conduct, but affirming directed verdict on other grounds); *Mindt v. Shavers*, 214 Neb. 786, 337 N.W.2d 97 (1983) (sexual assault sufficiently outrageous) *with Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 508 N.W.2d 907 (1993) (sexual relations over long period of time between priest and parishioner whom priest was counseling not outrageous conduct and demurrer properly sustained despite the fact that parishioner was vulnerable due to prior emotional problems); *Gall v. Great W. Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985) (conduct of insurance agent in calling employee's wife and telling her that employer had a job that could be performed by a person with one arm and because it was not certain that husband's hand could be saved, husband would be required to accept job or he would be fired and all insurance cancelled was not sufficiently outrageous and summary judgment was properly granted); *Hassing v. Wortman*, 214 Neb. 154, 333 N.W.2d 765 (1983) (reversing judgment and holding that conduct of former spouse in harassing plaintiff by driving her off the road and entering her home, attempting to get her fired from teaching job, and spreading rumors that she was pregnant when she and defendant were first married was not sufficiently outrageous); *Davis v. Texaco*, 210 Neb. 67, 313 N.W.2d 221 (1981) (sustaining trial court's refusal to submit case

to jury and holding that woman who was burned when hot liquid spilled on her at filling station and who removed her blouse as a result of burns, but was initially not given anything with which to cover herself and then was impeded from leaving the filling station to go to the hospital until she returned the fender she was using to cover herself, did not involve sufficiently outrageous conduct); *Paasch v. Brown*, 193 Neb. 368, 227 N.W.2d 402 (1975) (sustaining demurrer and holding that failure to promptly accomplish act required by court decree not sufficient).

In this case, Rawalt's conduct is not "outrageous" as that term is defined under Nebraska law. A straightforward comparison of past Nebraska cases with the facts of this case readily establishes this point. Indeed, as my colleague United States District Judge Thomas M. Shanahan noted in a dissent when he served on the Nebraska Supreme Court, the Nebraska court has adopted a standard which allows a "jury determination of 'outrage' only in cases of conduct which would cause Attila the Hun to cringe." *Gall*, 219 Neb. at 364; 363 N.W.2d at 380. This is certainly not one of those situations.

A few additional comments are nevertheless helpful.

The first statement regarding Rawalt's desire to have Cole take a polygraph examination was made the night the search warrant was executed. If Plaintiffs are to be believed, and I must believe them for purposes of the motion, the statement was made at the Cole residence shortly before Cole and Herman left for the offices of CTC, (Filing 27, Cole Decl. ¶ 22p), and repeated again at CTC. (Filing 27, L.S. Cole Decl. ¶ 18.) Steve Herman, Cole's lawyer, was with Cole during this time period. (Filing 27, Herman Decl. ¶¶ 4–15.)

A request to take a polygraph examination is not improper, and it is certainly not outrageous. While a "threat" to induce someone to take a polygraph test is clearly improper, such a threat is not "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." This is particularly true where, as here, the threat was directed by an FBI agent to a suspect who had been permitted by the agent to summon a lawyer, and legal counsel at the suspect's side had a full and complete opportunity to confer privately with the target of the threat.

A threat such as the one alleged here does not present a situation where "bullying tactics" or "high pressure" methods are likely to be harmful since the threat is made to a person who has legal counsel available to him. *See, e.g., Restatement (Second) of Torts* § 46 cmt. e at 74 (1965) (discussing the liability of police officers for the tort of intentional infliction of emotional distress and emphasizing that liability exists only where there is an "extreme abuse of their position"). Moreover, for a police officer's improper threat to be actionable, the action must normally involve some plainly improper motive, such as extortion. *Id.* (noting that a threat to arrest by itself might not be sufficient, but a threat to arrest coupled with an attempt to extort money would be sufficient). Here, there is no evidence that Rawalt's motivation was anything other than the (perhaps overzealous) pursuit of a criminal investigation.

The second statement regarding the fact that the subscriber carrier card was at the FBI laboratory and if the report came back "right," charges would be filed was allegedly made around 5:58 p.m. on January 5, 1993, while Rawalt was delivering some of the computer tapes that had been seized to Cole at his residence. (Filing 27, Cole Decl. ¶ 26.) The statement was allegedly made after Cole filed the tort claim, (*id.*, ¶ 26b), and in the presence of a deputy Frontier County sheriff. (*Id.* ¶ 26a.) The statement was allegedly made in an exchange between Cole and Rawalt about when the subscriber carrier card would be returned to CTC. (*Id.*, at ¶ 26c.)

There is nothing "outrageous," as that term is understood by reference to Nebraska law, about the second statement. The statement was allegedly made in the presence of an impartial third party while Rawalt was performing the function of a delivery person some seven months after the search warrant was executed. As a consequence, there was little or no opportunity for Rawalt to exploit

his position of power as an FBI agent at that time and place, and, accordingly, Cole had no reason to fear Rawalt's statement unduly. Threats alone are not sufficient to constitute "outrageous" conduct: "The liability clearly does not extend to mere ... threats...." *Restatement (Second) of Torts* § 46 cmt. d at 73.

Still further, this second statement *post-dated* the filing of the tort claim in this case. Therefore, this second statement obviously cannot serve as a predicate for the tort claim. The United States has waived its sovereign immunity *only* for tort claims that have been subjected to administrative review. 28 U.S.C § 2675(a). Accordingly, the second statement is not actionable.

## G. Seventh Cause of Action: Negligent Testing and Analysis by Howen

Plaintiffs' seventh cause of action alleges a tort claim against the United States based upon the allegation that Howen was negligent in his testing and analysis of the tapes Zak made of the unusual noises. (Filing 12, ¶ 84.) There are no specifications of negligence in the amended complaint. In their brief, however, Plaintiffs endeavor to make this general allegation more specific by claiming Howen was negligent primarily because he failed to consider the possibility that subscriber carrier equipment might be involved. (Pls.' Br. at 60–61.) Although it is not entirely clear, Plaintiffs apparently also claim Howen was negligent in agreeing to test and analyze the tapes because he lacked the requisite competence. I conclude that the amended complaint does not state a claim upon which relief may be granted, and even if it did, summary judgment must be granted in favor of the United States.

▆ First, Howen was a technically trained special agent who was asked in the context of a criminal investigation to provide an opinion to an FBI field agent about the source of an unusual tone. There is no allegation (or proof) that Howen was required to conduct the testing and analysis in any particular way. Indeed, the very nature of the

endeavor—forensic electrical engineering—suggests that Howen was to use his discretion about how best to approach this investigative task.

This being true, the discretionary-function exception to the FTCA comes into play. Title 28 U.S.C § 2680(a) withdraws the government's sovereign-immunity waiver for claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." How and under what circumstances law enforcement officers conduct an investigation has long been held to be a discretionary function for which there is no tort claim liability. *Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.), *cert. denied,* 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986) (holding that decision to use an informant and the extent of control exercised over informant in a criminal investigation was a discretionary decision exempt from review in an action for an alleged unlawful arrest and prosecution, and stating that "when the sole complaint is addressed, as here, to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply. *Congress did not intend to provide for judicial review of the quality of investigative efforts.*") (emphasis added). *See also Prelvitz v. Milsop,* 831 F.2d 806, 810 (8th Cir.1987) (decision whether to detain a suspected drunken driver or suggest that someone else drive "would necessarily require an exercise of judgment by Inspector Bishop and therefore is protected as a discretionary function"); Daniel A. Morris, *Federal Tort Claims* § 15.3.

I thus hold as a matter of law that the quality of Howen's forensic electrical engineering investigation—both what he did and did not do—is shielded from judicial review under the discretionary-function exception found in 28 U.S.C. § 2680(a) because Congress did not intend for the courts to determine whether such criminal investigative endeavors are negligently conducted.[27] Ac-

---

27. In this regard, I note that the provision of the FTCA regarding suits for false imprisonment and the like is not applicable to the seventh cause of action because that provision pertains to intentional torts within the "course of a search, a seizure or an arrest...." *Pooler,* 787 F.2d at

cordingly, the motion to dismiss under Fed. R.Civ.P. 12(b)(6) must be granted as to Plaintiffs' seventh cause of action.

█ Second, even if the amended complaint could somehow survive a motion under Rule 12(b)(6), the motion for summary judgment must be granted since on the undisputed facts (a) there was nothing negligent in the testing Howen conducted; (b) there was nothing negligent about Howen's opinion, given the undisputed fact that subscriber carrier equipment, while not unusual, would not normally be found in a rural community with low growth; and (c) Howen's qualifications were clearly sufficient to allow him to confidently express an opinion on a forensic electrical engineering question. In this case, Plaintiffs would be required to prove by the preponderance of the evidence that Howen breached his duty of due care to "use the skill and knowledge ordinarily possessed by other [electrical engineers] in good standing in the [profession], in the same or similar circumstances." *NJI2d* § 12.04, at 699 (defining duty of one rendering professional services and noting in comment I that this duty pertains to engineers).

Plaintiffs apparently claim that Howen negligently measured the frequency of the tone at 300 hertz as opposed to their expert's measurement of 328 hertz. I assume for purposes of the motion for summary judgment that the exact measurement was 328 hertz as suggested by Plaintiffs' expert.[28] (Filing 27, Brooks Decl. ¶ 6.) Nevertheless, this difference is immaterial because even if the subscriber carrier unit was performing correctly, it would produce a frequency in the range of 330 hertz *plus or minus* 10 percent.

(Filing 30, Howen Decl. ¶ 1.) Thus, whether the measurement was 328 hertz or 300 hertz is irrelevant because Howen's measurement was in the range of frequencies that might be expected *if* one realized subscriber carrier equipment was being used. In fact, Plaintiffs' expert attributes no significance to the difference in measurements, (Filing 27, Brooks Decl. ¶ 6), since this equipment normally produces frequencies in the ranges found by *both* Plaintiffs' expert and Howen. Therefore, the measurement was not negligently made.

Plaintiffs also claim Howen was negligent because he did not realize that subscriber carrier equipment was being used at CTC, and as a consequence, Howen failed to realize that while normal switching and other "home office equipment" might not produce such a tone, subscriber carrier equipment could produce such a tone if it malfunctioned. It is clear that subscriber carrier equipment is not unusual equipment. However, Howen stated under oath, *and his statement has not been controverted,* that it would be unusual to find such equipment at CTC, whether or not it is otherwise common:

> Based on my training and experience, the use of carrier equipment at the Curtis Telephone Company would be unusual since this equipment is generally used in areas where there is dense population or there has been more rapid growth than is present in that particular area of Curtis. In fact, during my conversations with the plaintiff, Eddie Cole, he indicated that the only reason that carrier equipment was utilized in the neighborhood in question was due to the fact that it had been anticipated that there would be significant

872 (construing 28 U.S.C § 2680(h)). Here, Howen's testing and analysis significantly predated both the issuance and the execution of the search warrant. And, as noted earlier, there is no evidence that Howen "seized" anyone. Moreover, even if Howen was negligent, his "negligent" actions were certainly not intentional; thus, the "law enforcement" exception found in section 2680(h) regarding such things as false imprisonment is not applicable since the implicit predicate for the exception is that the tortfeasor acted intentionally.

28. As Howen noted, he was required to make the frequency measurements from a *duplicate* tape of the sound. (Filing 30, Howen Decl. ¶ 1.) This

duplication undoubtedly explains the relatively slight difference between his measurement and that of Plaintiffs' expert. It is probable that the speed of the recording equipment used to make the duplicate tape of the sound rendered a perfectly precise frequency measurement difficult, if not impossible. (*Id.*) Plaintiffs' expert was able to measure the frequency by testing the subscriber carrier card in his laboratory. (Filing 27, Brooks Decl. ¶¶ 4–5.) Obviously, the subscriber carrier card was not available to Howen when he made the frequency measurement of Zak's duplicate tape. As noted in the text, this slight difference was of no significance in any event.

growth in that specific neighborhood which had not in fact occurred.

(Filing 30, Howen Decl. ¶ 2.)

Consequently, there was nothing negligent about Howen's failure to recognize that CTC might be using subscriber carrier equipment and that if such equipment malfunctioned, it might cause the strange noise because a reasonable person would not have expected to find such equipment being used by CTC.

Finally, although Plaintiffs do not dispute Howen's credentials, they apparently contend that he was not competent to make the tests and do the analysis at issue here. Accordingly, Plaintiffs argue that Howen was negligent in undertaking a task he was not competent to perform. There is simply no disputed evidence to submit to a jury concerning this point. On the contrary, all the evidence establishes that Howen was competent.

The undisputed evidence is that Howen holds a bachelor's degree in electrical engineering, that he has extensive experience and training in the subject of wiretaps, and that he has specific training in telephone repair. (Filing 18, Howen Decl. ¶¶ 2–3.) There is no evidence suggesting that this type of education, training, and experience would be insufficient to conduct the forensic electrical engineering investigation at issue in this case. On the contrary, Plaintiffs' concede that they "are in something of a quandary here, in that they do not dispute that Howen possesses a degree in electrical engineering and are unable at this time to dispute the extent and depth of his additional training, in that very few facts are available." (Pls.' Br. at 60.)

Accordingly, Howen was not negligent when he undertook the evaluations at issue here because his training, education, and experience indisputably establish that he had the special skills necessary to competently accomplish the task.

## III. SUMMARY

The length and complexity of the foregoing opinion may make a brief summary helpful:

With regard to Plaintiffs' first cause of action concerning the search-warrant affidavit, I find and conclude the following:

A. As to Special Agent Howen, I hold that the motion to dismiss and alternative motion for summary judgment should be granted on the undisputed facts regarding the first cause of action because, examined in light of *Franks v. Delaware,* (1) Plaintiffs' amended complaint and proof fail to allege or establish that anything in the search-warrant affidavit attributable to Howen was false, and (2) even if something in the search-warrant affidavit attributable to Howen was false, there is no pleading or showing that such falsity was the result of a lie on Howen's part or that such falsity was the result of Howen's reckless disregard for the truth.

B. As to Special Agent Rawalt, I hold that the motion to dismiss and alternative motion for summary judgment should be granted on the undisputed facts regarding the first cause of action because, examined in light of *Franks v. Delaware,* (1) Plaintiffs' amended complaint and proof fail to allege or establish that anything in the search-warrant affidavit attributable to Rawalt was false, and (2) even if something in the search-warrant affidavit attributable to Rawalt was false, there is no pleading or showing that such falsity was the result of a lie on Rawalt's part or that such falsity was the result of Rawalt's reckless disregard for the truth.

C. As to the "Five Unknown FBI Agents," I hold that the motion to dismiss and alternative motion for summary judgment should be granted on the undisputed facts regarding the first cause of action because Plaintiffs' amended complaint and proof fail to allege and establish that the Five Unknown FBI Agents specifically did or failed to do something that amounted to a constitutional tort.

D. I hold that the motion for summary judgment should be granted because all the defendants are entitled to qualified immunity regarding the first cause of action when the substantive law found in *Franks v. Delaware* is applied.

With regard to Plaintiffs' second cause of action concerning the execution of the search warrant, I find and conclude the following:

A. As to Special Agent Howen, I hold that the alternative motion for summary judgment should be granted on the undisputed facts regarding the second cause of action because the evidence, if it shows anything, shows only that Howen was present at the Cole residence, and mere presence is not enough to establish liability because the agent had a right to be in the home by virtue of the search warrant.

B. As to Special Agent Rawalt, I hold that on the undisputed facts (a) pertaining to the first part of the second cause of action regarding the timing of the search-warrant execution, the motion for summary judgment should be granted as there was nothing objectively unreasonable about Rawalt's staying at the Cole house past 10:00 p.m.; (b) pertaining to the second part of the second cause of action regarding the alleged "arrest," the motion for summary judgment should be granted because even if Cole and his family were "seized" for Fourth Amendment purposes, the seizure was justified under *Michigan v. Summers;* and (c) pertaining to the third part of the second cause of action regarding the manner in which the search warrant was executed, the motion to dismiss and the alternative motion for summary judgment should be granted since there is no pleading or proof that Rawalt executed the search warrant in an objectively unreasonable manner.

C. As to the "Five Unknown FBI Agents," I hold that the motion to dismiss and alternative motion for summary judgment should be granted regarding the second cause of action because Plaintiffs' amended complaint and proof fail to allege and establish that the Five Unknown FBI Agents executed the search warrant in an objectively unreasonable manner.

D. I hold that the motion for summary judgment should be granted because all the defendants are entitled to qualified immunity regarding the second cause of action (a) when the substantive law found in *United States v. Young* is applied re-

garding the timing of the search-warrant execution; (b) when the substantive law found in *Michigan v. Summers* is applied to the alleged "seizure"; and (c) when the substantive law found in *Dalia v. United States* is applied to the manner in which the search warrant was executed.

With regard to Plaintiffs' third cause of action concerning consultation with counsel, I find and conclude the following:

A. As to Special Agent Howen, I hold that the alternative motion for summary judgment should be granted regarding the third cause of action because Plaintiffs concede that Agent Howen had no involvement in this alleged deprivation.

B. As to Special Agent Rawalt, I hold that the alternative motion for summary judgment should be granted regarding the alleged interference with the right to counsel because on the undisputed facts (a) even if Cole and his family were "seized" for Fourth Amendment purposes, the seizure was justified under *Michigan v. Summers,* and there was no constitutional tort since Cole and his family were permitted to freely consult with counsel; and (b) even if Rawalt failed to advise Cole of his *Miranda* rights, such failure, when viewed in light of *Warren v. City of Lincoln,* is not actionable in a civil suit because Cole was never charged with a crime.

C. As to the "Five Unknown FBI Agents," I hold that the alternative motion for summary judgment should be granted for the same reasons it should be granted regarding Rawalt. Moreover, even if one unknown female FBI agent did tell Mrs. Cole not to call the family attorney, there was no constitutional deprivation because Mrs. Cole ignored the agent.

D. I hold that the motion for summary judgment should be granted because all the defendants, except one unknown female FBI agent, are entitled to qualified immunity regarding the third cause of action (a) when the substantive law found in *Michigan v. Summers* is applied to the alleged "seizure" and deprivation of the right to counsel because Plaintiffs were able to freely consult with counsel; and (b) when the substantive law found in *Warren*

*v. City of Lincoln* is applied to the alleged failure to give *Miranda* warnings.

With regard to Plaintiffs' fourth cause of action, I find that this claim concerning "seizure" of the Cole family should be resolved in precisely the same manner as the second part of the second cause of action, to wit, given the undisputed facts, the alternative motion for summary judgment should be granted on the merits and on the issue of qualified immunity.

With regard to Plaintiffs' fifth cause of action concerning the tort claim involving "false imprisonment," I find and conclude that the alternative motion for summary judgment should be granted because on the undisputed facts, and assuming an "imprisonment" resulted from the alleged "seizure" of the Cole family, the "imprisonment" was nevertheless authorized by a valid search warrant, when the warrant is read in light of *Summers*, and Nebraska law, such as *Cimino v. Rosen*, therefore bars recovery.

With regard to Plaintiffs' sixth cause of action concerning the tort claim involving intentional infliction of emotional distress, I find and conclude that the alternative motion for summary judgment should be granted because on the undisputed facts, Defendants' alleged conduct was not under Nebraska law "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." *NJI2d* § 9.04.

With regard to Plaintiffs' seventh cause of action concerning the tort claim involving Howen's alleged negligent testing and analysis, I find and conclude the following:

A. The motion to dismiss should be granted because under such cases as *Pooler v. United States*, the quality of a criminal investigation has been held to involve a discretionary function, as provided in 28 U.S.C § 2680(a), for which there is no tort claim liability.

B. The alternative motion for summary judgment should be granted because on the undisputed facts (a) the difference in the hertz measurements made by Howen and Plaintiffs' expert is immaterial and Howen was not negligent in measuring the frequency at 300 hertz; (b) subscriber carrier equipment would not normally be found in Zak's neighborhood and Howen was not negligent in failing to realize that such equipment was present and could malfunction, thereby causing the suspect tone; and (c) Howen's qualifications were such that he was competent to do the testing and analysis performed in this case and therefore he was not negligent when he undertook those endeavors.

Finally, this is one of those regrettable but inevitable cases that Judge Learned Hand had in mind when he observed: "Again and again the public interest calls for action which may turn out to be founded on a mistake." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). As Judge Hand recognized, the public interest would be harmed if public officials were as a result of an honest mistake put "to the burden of a trial and the inevitable danger of its outcome." *Id.* This is true because the fear of such a trial "would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Id.* Thus, "it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than subject those who try to do their duty to the constant dread of retaliation." *Id.* While I am convinced that the FBI was mistaken in its suspicion of Cole, I am equally satisfied that the mistake was an honest and understandable one.

Accordingly,

IT IS ORDERED that:

(1) Defendants' motion to dismiss, or in the alternative, for summary judgment (Filing 17) is granted;

(2) By separate document, judgment shall be entered providing that Plaintiffs shall take nothing from Defendants, Plaintiffs' amended complaint is dismissed, and summary judgment is entered in favor of Defendants and against Plaintiffs.